**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WHITE MOUNTAIN APACHE TRIBE,** a federally-recognized Indian tribe, 201 East Walnut Street, Whiteriver, Arizona, 85941, <br><br> **Plaintiff**, <br><br> **v.** <br><br> **EUGENE SCALIA, in his official capacity as Secretary, United States Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210,** <br><br> **PRESTON RUTLEDGE, in his official capacity as Assistant Secretary, Employee Benefits Security Administration, United States Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210,** <br><br> **and** <br><br> **UNITED STATES OF AMERICA, c/o Attorney General of the United States Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-0001** <br><br> **Defendants.** | **Case No. 20-1409** |

## COMPLAINT

Plaintiff makes and files this Complaint against Defendants and alleges as follows:

## THE PARTIES

1.    Plaintiff, White Mountain Apache Tribe (the "Tribe" or "Plaintiff"), is a federally-recognized Indian tribal government.  Plaintiff is the sponsor and Plan Administrator of the White Mountain Apache Tribe Retirement Savings and 401(k) Plan (the "Plan").  The Tribe is located in Whiteriver, Arizona, on the Fort Apache Indian Reservation ("FAIR" or

"Reservation").  The address of Plaintiff's Tribal Administration Office is: 201 East Walnut Street, Whiteriver, Arizona 85941.

2.      Defendant, the Honorable Eugene Scalia, is the Secretary of the United States Department of Labor ("DOL") and is sued in his official capacity.  Secretary Scalia has overall responsibility for carrying out all of the functions, duties and responsibilities of the DOL, including, without limitation, consultation with Indian tribal governments under Executive Order 13175 and DOL consultation policies, and regulatory and enforcement responsibilities under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  These duties also include interpretation, administration, and enforcement of requirements applied to Indian tribal governments by ERISA Section 3(32) and Section 906 of the Pension Protection Act of 2006 (referred to herein as the "PPA").  The Secretary's office address is: U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

3.      Defendant Preston Rutledge is the Assistant Secretary of Labor for the Employee Benefits Security Administration ("EBSA") and is sued in his official capacity.  Assistant Secretary Rutledge exercises authority delegated to him by the Secretary of Labor to carry out certain of the Secretary's responsibilities under ERISA, including those applied to Indian tribal governments and added by the PPA and other applicable law.  EBSA is the agency within DOL which is responsible, by way of example, for enforcement of annual filing requirements under Form 5500 and for penalty and enforcement actions that are the subject of this Complaint.  His office address is: U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

4.      Defendant United States of America owes certain trust responsibilities and other duties to deal with the Tribe on a government-to-government basis, arising out of federal statute,

Executive Orders and the federal common law.  The DOL and EBSA at all times herein were acting on behalf of the United States of America, and references to the DOL and EBSA shall include references to the United States of America as necessary to secure complete relief herein.

## JURISDICTION

5.      The Court has jurisdiction over this action, without limitation, pursuant to 29 U.S.C. § 1132(k) (final actions under ERISA), 5 U.S.C. §§ 702, *et. seq.* (the Administrative Procedure Act (the "APA"), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (injunctive relief), 28 U.S.C. § 2202 (declaratory relief), and 28 U.S.C. § 1362 (actions by Indian tribes). Plaintiff's claim arises under the Constitution and laws of the United States, including ERISA, the APA, and the trust obligations and responsibilities of the United States to Indian tribes.  An actual justiciable controversy exists between Plaintiff and Defendants arising under the Constitution, laws or treaties of the United States.

6.      Venue is proper pursuant to 29 U.S.C. § 1132(k), which expressly grants jurisdiction and venue for the review of final orders of the Secretary under ERISA in the United States District Court for the District of Columbia, and 28 U.S.C. § 1391(e), because Defendants are being sued in their official capacity, were acting on behalf of the United States in respect to the allegations of this Complaint, and reside within this judicial district.

## INTRODUCTION AND STATEMENT OF THE CASE

7.      This case will decide whether a sub-agency within the Department of Labor, without any mandate or expertise in addressing Indian policy, has overstepped its bounds in deciding that an Indian tribal government is not acting "governmental".  The Tribe contends that it was an abuse of discretion for DOL to rely on the *ad hoc* opinions of EBSA staff regarding what constitutes a "governmental" or "commercial" function without having engaged in formal

rulemaking, by imposing requirements outside of published transition relief without notice and comment, and by failing to consult with tribal governments as required by DOL policy and Executive Order 13175. The Tribe further contends that DOL abused its discretion by abandoning its own practice of non-enforcement pending guidance under the PPA, without prior notice or explanation.

8.      DOL failed to work with tribal governments and organizations, Congressional committees, and other federal agencies charged with developing Indian policy. DOL failed to construe ambiguity in favor of Indian tribes as required by long-recognized Indian canons of construction. DOL failed to coordinate with the Department of Treasury, despite sharing jurisdiction with Treasury over the statutes at hand, and DOL disregarded the fact that Treasury has acknowledged the need for pre-enforcement guidance and consultation with tribes on the very same definitions at issue in this case.

9.      The Tribe seeks a declaration that DOL must work with Tribes and Treasury to develop rules under the PPA through consultation and formal rulemaking, and that DOL must resolve ambiguity under ERISA Section 3(32) and the PPA in favor of tribal governments. The Tribe contends that generating revenue for public purposes is an essential "governmental" function, and that activities designed to fund the public fisc rather than private interests are not "commercial" in nature.

10.     The Tribe also seeks a refund of One-hundred Forty Thousand Dollars ($140,000) in "commercial" based penalties it has paid under ERISA Section 502(c)(2). The Tribe's retirement program should be entitled to government plan status as a matter of statutory construction. The Tribe is also entitled to relief based on a showing of reasonable cause, and DOL's failure to address regulatory waivers that should have been considered and granted under

the facts at hand.  DOL's actions in this case were arbitrary, capricious, and contrary to applicable law.  Without limitation:

- DOL has failed to follow prior notice and consultation requirements under Executive Order 13175 and existing DOL policies;
- DOL has disregarded long standing Congressional and Executive Branch policies underscoring the government-to-government relationship between the Federal and tribal governments;
- DOL has failed to comply with rulemaking responsibilities including notice and comment, and participation by tribes;
- DOL has acted contrary to the unique trust obligations and responsibilities of the United States to the Tribe and other Indian tribes;
- DOL has denied access to information needed by the Tribe to defend itself against enforcement actions;
- DOL has misapplied its own regulations for the waiver of penalties;
- DOL has disregarded internal DOL policies or practices of non-enforcement pending rulemaking guidance to the Tribe and other Indian tribes;
- DOL has applied arbitrary, inconsistent, and unworkable deadlines for the Tribe and other Indian tribes to meet non-government Plan standards; and
- DOL has inconsistently, erroneously, and selectively applied IRS transition relief in the absence of adopting formal rules for tribal government plans.

## GENERAL ALLEGATIONS

11.     At all times relevant to this Complaint, DOL and EBSA (collectively referred to herein as "DOL" unless otherwise noted) are or were acting on behalf of the United States of America.

12.     DOL is charged with certain enforcement and regulatory responsibilities with regard to ERISA and the PPA, certain functions of which are delegated to EBSA.

13.     The United States Department of the Treasury ("Treasury"), in part through the Internal Revenue Service (the "IRS"), and the Pension Benefit Guarantee Corporation (the "PBGC") share certain responsibilities with DOL for certain enforcement actions and regulation of ERISA.

14.     On information and belief, DOL, Treasury and PBGC work together in the establishment of regulations and guidance under ERISA, particularly where compliance requirements overlap between the three agencies.  *See, e.g*., 29 U.S.C. § 1204.

15.     This action pertains primarily to identical and overlapping requirements added to ERISA and the Internal Revenue Code (the "Code") by Section 906 of the PPA.  Specifically, the PPA added identical language to ERISA Section 3(32) and Code Section 414(d) confirming that certain Indian tribal government Plans are to be treated as "governmental plans" under ERISA and the Code; provided that they cover employees performing essential governmental functions that are not commercial in nature.

16.     Tribal plans that cover both employees who are eligible for governmental plans and those who are not (e.g., individuals who engage in "commercial" activities) are referred to herein as "mixed plans".

17.     In Notice 2006-89 and Notice 2007-67, Treasury issued transition relief (the "Transition Relief") providing, in part, an extended deadline for tribal governments with mixed plans to split off new "commercial" plans subject to ERISA.

18.     The Treasury's published deadline for establishing new commercial plans under Notice 2007-67 is a date that is "six months after the issuance of final guidance under the PPA" (which has not yet occurred).   Throughout this Complaint, Plaintiff refers to the period from the enactment of the PPA in 2006 through the date that new plans must be split off or established following final guidance under the PPA as the "Transition Period".

19.     The establishment of separate governmental plans and commercial plans for tribal governments is important because these plans are subject to different compliance requirements under both ERISA and the Code.

20.     The case at bar deals primarily with reporting requirements that apply to commercial plans, and for which DOL and Treasury share a common annual report ("Form 5500") to satisfy both Treasury and DOL compliance.

21.     Administrators of commercial plans must file Form 5000s for both DOL and Treasury compliance.

22.     DOL also requires certain ERISA plans under its jurisdiction to attach an Independent Qualified Public Accountant's report (an "IQPA") to the Form 5500, which provides information on ERISA plan assets.

23.     Administrators of governmental plans are exempt from Treasury and DOL Form 5500 filing requirements.  Governmental plan assets are also exempt from the requirements of an IQPA.

24.     Both IRS and DOL share authority to assess penalties for failure to file a Form 5500.

25.     In the case at bar, the Tribe maintains a combined trust for all employees and is not yet required to split off commercial plan assets or to establish or spin off a separate commercial plan under the Transition Relief's extended deadline.

26.     The IRS has not challenged the Tribe's Form 5500 filings for the 14 years since enactment of the PPA.  However, DOL has assessed the Tribe One Hundred Forty Thousand Dollars ($140,000) in Form 5500 reporting penalties for failure to include an IQPA.

27.     On information and belief, DOL has justified its penalty assessments by imposing an arbitrary deadline to split off separate commercial plans contrary to the extended time for splitting plan assets under the Transition Relief.

28.     DOL's enforcement position and deadline for splitting plan assets is in conflict with the Transition Relief.

29.     At all times relevant to this Complaint, DOL and Treasury are executive agencies of the Federal government.

30.     At all times relevant to this Complaint, DOL and Treasury were (and remain) under a duty to consult with Indian tribal governments on a government-to-government basis in the development of guidance under the PPA.

**Prior Efforts to Secure Guidance on the Treatment of Indian Tribes under ERISA**

31.     The Tribe began seeking guidance in the 1990s as to whether its retirement Plan was entitled to governmental plan status or should be structured under the private sector ERISA rules.

32.     On October 26, 1995 and then again on March 12, 1999, the Tribe received favorable determination letters from IRS approving its Plan under the government plan rules. The 1999 letter states in part that "[t]his plan is a governmental plan."

33.     The Plan covered tribal employees working in the government administrative offices, as well as those working for tribal enterprises, and just like many State and local government plans, neither the Tribe nor IRS historically drew distinctions based on the activities performed by individual participants in the Plan.

34.     From 2003 through 2006 the Tribe engaged in efforts to secure legislation consistent with the favorable determination letters it had received.

35.     During this period, several bills were introduced in Congress to ensure equal government status for tribes with regard to tribal pension plans. *For example*, H.R. 3605, November 21, 2003, S. 2831, September 22, 2004, S. 673, March 17, 2005 and H.R. 331,

January 25, 2005.  No bills introduced during that period included any language treating tribal "commercial" and "governmental" functions differently.

## Enactment of the Pension Protection Act of 2006

36.     In August of 2006, the PPA was signed into law and included the following language:

> The term "governmental plan" includes a plan which is established and maintained by an Indian tribal government (as defined in section 7701(a)(40) of title 26), a subdivision of an Indian tribal government (determined in accordance with section 7871(d) of title 26), or an agency or instrumentality of either, and all of the participants of which are employees of such entity substantially all of whose services as such an employee are in the performance of essential governmental functions but not in the performance of commercial activities (whether or not an essential government function)

37.     The undefined "essential governmental functions" and "commercial activities" requirements did not appear in any underlying bill.  These were added during the conference committee process.

38.     Moreover, there were no floor debates or other evidence of any Congressional consideration of these terms as the bill was pulled from conference committee early and voted on without debate prior to recessing for the 2006 election cycle.

39.     In fact, Treasury has struggled without success for decades trying to establish similar standards and definitions under the Indian Tax Status Act, 26 U.S.C. § 7871.  The United States Supreme Court has also struck down similar concepts as futile (*see, e.g., Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 541-542 (1985)).

## Efforts to Secure Guidance Following the PPA; Transition Relief

40.     Following enactment of the PPA, IRS and Treasury acknowledged that tribes would need guidance on how to determine what employees were performing essential

governmental functions and what employees were performing commercial activities *before* tribes could split tribal mixed plans into separate governmental and commercial plans under the PPA.

41.     Treasury promptly issued the Transition Relief pending an opportunity to consult with tribes under Executive Order 13175, and committed itself to working with tribal governments in developing final regulations to implement the PPA.

42.     The Transition Relief included an initial listing of categories deemed to be government and commercial during the Transition Period, but provided an extended deadline for tribes to establish separate commercial plans.  Treasury also indicated that these categories, as well as compliance requirements needed to coordinate separate plans, would be subject to consultation before any final rules were developed.

43.     Consultation was in fact initiated with tribes from 2006 through 2012, through which Treasury solicited written and oral comments in an attempt to develop guidance under the PPA.  Many oral and written comments were provided by tribal governments, associations, and organizations during this period explaining why enterprise activities designed to produce funds for public purposes should not be considered "commercial", and explaining the difficulties and expense in maintaining split plans.

44.     The Tribe participated in these PPA consultation efforts, including the preparation of comments.

45.     The Tribe, through counsel, for example, consulted with Treasury in May through August of 2007 regarding requests to extend good faith relief for Tribes pending guidance under the PPA.  These cooperative efforts ultimately led to the publication of Notice 2007-67, and joint efforts to coordinate consultation meetings with the National Congress of American Indians and

the Native American Finance Officers Association on Notice 2007-67 and the need for further guidance under the PPA.

46. In January of 2008, the Tribe, through counsel, also reached out to Treasury for direction on technical compliance requirements under the PPA, and confirmation of the "good faith" standard and Transition Relief. Treasury confirmed at the time that they were coordinating guidance with DOL and PBGC.

47. On April 30, 2008 (before any enforcement actions against the Tribe) the Tribe, through counsel, wrote to five of the then top officials within Treasury and IRS specifically asking for consultation and relief under Executive Order 13175 on behalf of the White Mountain Apache Tribe and reiterating its then 20-year history in seeking guidance on pension compliance.

48. A written decision on the Tribe's April 30, 2008 request was not issued, but a call was conducted on June 9, 2008 with various Treasury and IRS representatives believed to include William Bortz, Christie Jacobs, Marty Pippens, Ingrid Grinde, Gwendolyn Prophet, and Andrew Zuckerman. The call detailed several technical compliance issues that needed further guidance and presented challenges to Form 5500 filings, including:

- employee transfers;
- plan asset rules and distribution events;
- administering loans for employees participating in both governmental and commercial plans;
- service crediting rules (including control group testing and re-hire rules);
- remedial amendments periods;
- Qualified Domestic Relations Orders (QDROs);
- the definition of what is "operational" compliance required under the Transition Relief; and
- plan determination letters.

49. The message from this meeting and broader consultation sessions at the time was clear: (1) more guidance was needed to address these technical and reporting issues, (2)

consultation would be conducted to consider tribal input in developing the guidance, and (3) tribes acting in good faith would *no*t be targeted for compliance deficiencies pending guidance.

50.     In August of 2008 the Tribe, through Plan counsel, reached out to Treasury specifically with regard to the lack of guidance on Form 5500 filing requirements.  In the ensuing conversations with agency officials (including William Bortz and Diane Bloom) it was confirmed that there was no consensus on the precise requirements that should apply pending guidance, and that issuing PPA guidance had become increasingly challenging due to the need to coordinate input from tribes, Treasury, PBGC, and DOL.

51.     In 2014-2016, efforts were made to initiate consultation with DOL and EBSA on PPA compliance and Form 5500 filing requirements, including DOL representatives Jeremy Bishop and Ali Khawar.  DOL ultimately declined consultation on PPA guidance, taking the position that *it was free to develop guidance through enforcement actions instead.*

52.     On November 19, 2015, application of the PPA and reporting requirements were addressed to the then EBSA Chief Accountant, Ian Dingwall, by phone.

53.     Despite the foregoing efforts to secure guidance, final rules under the PPA were never adopted.

54.     On information and belief, Treasury served as the primary point of contact with tribes for DOL on guidance under the PPA for the periods noted above.

55.     On information and belief, DOL participated with Treasury in developing the Transition Relief and agreed to abide by it, including the extended dates for splitting off "commercial" plans.

**No Guidance on Form 5500 Filings**

56.     The Transition Relief did not address whether tribes with "mixed plans" covering both government and commercial employees would need to file Form 5500s *before* having to be split into separate commercial and governmental plans.  In fact, there was no guidance on how such forms or associated IQPAs could be prepared at all with governmental and commercial plan assets allowed to be comingled pending the issuance of final rules.

57.     The Tribe, through counsel, specifically raised the need for additional guidance on Form 5500 filings and whether they were required for mixed plans during the Transition Period.  These issues were raised through Treasury as the primary point of contact for PPA consultation.   No guidance was ever issued.

58.     On information and belief, DOL was aware of inconsistencies and confusion on whether tribes needed to file Form 5500s during the Transition Period, but elected not to provide guidance.  For example:

- Some tribes with mixed plans did not file Form 5500s during the transition period at all, as tribes were not yet required to split off separate commercial plans.
- Some tribes with mixed plans filed Form 5500s but did not attach IQPAs, as commercial plan assets were not yet required to be split off separately.
- Some tribes filed Form 5500s and secured IQPAs based on combined government and commercial plan assets.

**DOL Policy and Practices of Non-Enforcement -
Reasonable Cause Accepted in 2011**

59.     In the absence of PPA guidance and direction on Form 5500 filings during the Transition Period, the Tribe elected to start filing Form 5500s, but did not attach an IQPA as assets had not been split off into a separate commercial plan.

60.     The Tribe included notices along with its Form 5500 filings explaining the lack of guidance under the PPA and that its filing was a good faith effort to comply with the Transition Relief.

61.     After filing under this manner for almost a half-decade without question, the Tribe received a notice from EBSA questioning its post-PPA filing practices for the first time in 2011 (dated March 23, 2011).

62.     In response, the Tribe submitted a reasonable cause statement and requested a waiver of penalties based on the lack of guidance under the PPA, the extended deadlines to establish separate commercial plans, and the Tribe's good faith effort to comply with the Transition Relief.

63.     By letter dated August 1, 2011, Ian Dingwall, EBSA's then Chief Accountant, withdrew all penalties in their entirety based on the Tribe's statement of reasonable cause and a satisfactory showing of mitigation.

64.     On information and belief, this was consistent with a policy or practice recognized by EBSA wherein it would not enforce Form 5500 or IQPA filing requirements against tribes until after the issuance of final guidance under the PPA, and until after tribes were required to split off separate commercial plans (the "Policy or Practice").

65.     At no time during the course of waiving the 2011 penalties did DOL ever inform the Tribe that the waiver was a "one-time deal" or contingent on the Tribe splitting off a new commercial plan *prior* to the Transition Relief extended deadlines.

66.     After receiving the waiver, the Tribe continued in good faith to follow the same filing practices accepted by EBSA in 2011 in each subsequent year, providing a brief explanation of the status of PPA guidance and extended Transition Relief dates.

**First Rejection of Reasonable Cause - Final Agency Action**
**Case No 2015-RIS-00023 ("WMAT I")**

67.     Almost three years after DOL accepted the Tribe's 2011 statement of reasonable cause, the Tribe received a new notice (dated September 15, 2014) questioning the lack of an IQPA.

68.     The Tribe provided the same explanations that were accepted as reasonable cause in 2011 and expected them to be accepted as:

- There were no changes in guidance under the PPA since 2011.
- The Tribe was still not required to split off a new commercial plan under the Transition Relief extended deadline.
- The Tribe still maintained comingled assets as permitted under the Transition Relief.

69.      However, this time EBSA rejected the Tribe's statement of reasonable cause, claiming (contrary to the Tribe's own experience) that DOL never had a Policy or Practice of non-enforcement *pending guidance* under the PPA.   The DOL assessed penalties of Fifty Thousand Dollars ($50,000) against the Tribe.

70.     The Tribe filed a request for hearing and final administrative appeal to the DOL Secretary, in Case number 2015-RIS-00023 ("WMAT I"), resulting in a final administrative action adverse to the Tribe on <u>May 28, 2019</u>.   The Tribe thereafter timely paid the assessment subject to its right to seek a refund through litigation.  As a final agency action, the decision is ripe for review in this Court.

71.     The Tribe contends that the final administrative action was in error.  Without limitation:

- DOL failed to apply the appropriate tribal law canon of construction requiring ambiguity in federal statutes to be construed in favor of tribes.

- DOL failed to decide summary decision in favor of the Tribe based on the legal arguments and statements of undisputed facts set forth in the Tribe's summary decision briefs filed in WMAT I;
- DOL erred in determining that there is no ambiguity with regard to "essential government functions" or "commercial" status.
- DOL erred by failing to adequately consider the Tribe's request for waiver, its showing of reasonable cause, and grounds for mitigation.
- DOL denied discovery needed by the Tribe to defend itself.
- DOL erred by accepting material facts by EBSA that were in dispute and contrary to evidence.
- DOL erred in its application of willful misconduct and mitigation.
- DOL failed to consider and distinguish its prior waiver for the Tribe, similar requests by other tribes on the same or similar grounds, and the impact of DOL's Policy or Practice of non-enforcement.
- DOL erred in refusing to consider the impact of Executive Order 13175 and the DOL tribal consultation policy.
- DOL erred in misconstruing the scope of the Transition Relief.
- DOL erred by failing to follow applicable regulations in considering reasonable cause or mitigating factors asserted by the Tribe.

### Second Rejection of Reasonable Cause - Final Agency Action: Case No 2017-RIS-00007 ("WMAT II")

72.     While WMAT I was still pending, and before a final agency action in that case, EBSA opened a new case for subsequent year filings (referred to herein as "WMAT II").

73.     DOL assessed additional penalties of Ninety Thousand Dollars ($90,000) against the Tribe for the filings covered by WMAT II.

74.     The Tribe submitted a timely statement of reasonable cause and request for waiver of penalties, including grounds then pending on appeal in WMAT I, as well as additional grounds that were not fully addressed in WMAT I.

75.     On information and belief, WMAT II was assigned to the same reviewer that denied relief to the Tribe in WMAT I, Buries Nivens III, and DOL simply deferred to its earlier decision in summarily rejecting the Tribe's requests for waiver and grounds for mitigation.

76.     On December 9, 2016 the Tribe filed a timely Answer and Request for Hearing, and WMAT II proceeded to summary decision with briefs due on May 28, 2019.

77.     After almost 2 1/2 years had passed since the Tribe filed its Notice of Appeal in WMAT I, the Secretary issued an adverse decision in that case on the very same day that the Tribe's summary decision brief was due in WMAT II.

78.     The timing of the decision in WMAT I, as well as the assignment of WMAT II to the same EBSA reviewer that denied the Tribe's prior request for reasonable cause and mitigation brings into question the fairness and objectivity of the DOL review in both cases.

79.     The Tribe's appeal in WMAT II was ultimately denied citing to the WMAT I decision on July 22, 2019, and became a final agency action twenty days later.  The Tribe thereafter timely paid the assessment subject to its right to seek a refund through litigation.  As a final agency action, the decision is ripe for review in this Court.

80.     The Tribe asserts error in WMAT II.  Without limitation, the Tribe asserts the same grounds for error asserted with respect to WMAT I, that the ALJ improperly decided summary decision based on the legal arguments and statements of undisputed facts set forth in the Tribe's summary decision briefs filed in WMAT II, and for the additional grounds set forth herein. The Tribe further asserts that the Administrative Law Judge applied the wrong standard of review, and improperly limited the scope of his review by declining to adequately consider matters such as needed discovery, unequal treatment, due process, and the impact of Executive Order 13175 and DOL policies (including the Policy or Practice of non-enforcement as well as DOL consultation policies).

## DOL Policy or Practice of Non-Enforcement

81.     On information and belief, DOL had a Policy or Practice of non-enforcement or waiver of Form 5500 penalties against mixed tribal plans pending the deadline to split off separate commercial plans under the Transition Relief.

82.     On information and belief, DOL changed its Policy or Practice without notice or explanation to the Tribe or tribal governments generally, who relied upon, and had the right to rely upon the unequivocally stated extension of time in the Transition Relief.

83.     Instead of providing notice of the change or guidance as to what was expected of tribes during the Transition Period, DOL denied that it ever had a Policy or Practice of non-enforcement.  This assertion, however, is contrary to experience of the Tribe and evidence the Tribe was able to secure primarily through limited voluntary disclosures in WMAT II.

84.     For example, an internal EBSA memo, dated July 19, 2011 confirms that EBSA found reasonable cause to withdaw a notice of intent to assess penalties against the Tribe on the grounds that the Tribe was not yet required to establish a separate commercial plan pending guidance under the PPA.  The memo provided in part as follows:

> The Tribe is a federally recognized Indian tribal government; the tribe has traditionally maintained a single 401(k) program for all government and enterprise employees.  With the enactment of Section 906 of the Pension Protection Act, however, the Tribe is not required to split "commercial" employees from the government plan in order for the Tribe to maintain its government plan status.  The actual date to split off the new enterprise plan into a separate document, however, has not occurred.

85.     While DOL asserted in WMAT I and WMAT II that the individual who drafted the above memo was not authorized to bind the agency, on August 1, 2011, the then EBSA Chief

Accountant followed the same approach.  He confirmed in writing that the Tribe had presented sufficient cause to justify a full withdrawal of penalties.

86.     On information and belief, the Chief Accountant is authorized to make DOL Form 5500 penalty decisions and policy in that regard.

87.     The same grounds were also accepted by EBSA for at least two other tribes.  On October 5, 2009, EBSA Reporting Compliance Specialist, Ketrin Oravecz, concluded that a 5500 Form filed by another tribe without an IQPA was satisfactory and that:

> a filing was not required for this plan because [the] Plan qualified under two IRS notices (IRS Notice: 2006-89 and 2007-67) that give Indian Tribe entities additional time to separate the commercial part of their function from the governmental function.  Case being closed with approval from Barbara Briley on 10/2/2009.

88.     On April 11, 2012, another EBSA reviewer found the same grounds sufficient to justify a full withdrawal of penalties initially assessed against yet another tribe for failure to attach an IQPA to their 5500 filing.  The "No Enforcement Action Taken" memo notes that "[i]t has been OCA's policy not to pursue cases against Indian tribes."

89.     In WMAT I and WMAT II, DOL attempted to explain the Policy or Practice as reflecting DOL's decision to extend the "courtesy" of a warning and additional time for tribes to come into compliance with the PPA requirements.

90.     DOL provided no evidence, however, that these waivers were communicated as a "warning" or that the waivers were contingent upon tribes coming into compliance before the Transition Period ended.  The Tribe provided sworn declarations to the contrary.

91.     Moreover, the DOL's position is in conflict with the published Transition Relief deadlines which are only triggered by consultation (which DOL has not engaged in) and a final rule (that has still not been published).

92.     On information and belief, DOL elected to ignore the Transition Relief extended deadlines and chose to engage in enforcement actions against tribes without prior notice, consultation, or benefit of a final rule.

93.     The Tribe was denied discovery to secure additional information on the DOL Policies or Practice in this regard.

### Unequal Treatment

94.     On information and belief, many tribes and tribal enterprises across the country reasonably elected not to file Form 5500s during the Transition Period as (1) the Transition Relief does not purport to require such filings, (2) there is no guidance on whether or how to file an IQPA on ERISA plan assets before there is a separate ERISA plan on which to file, (3) neither Treasury nor DOL enforced Form 5500 filing requirements until the unannounced change in enforcement Policy or Practice referred to herein, and (4) the enforcement actions taken by DOL have been inconsistent.

95.     On information and belief, both agencies elected not to enforce Form 5500 penalties for mixed plans pending guidance under the PPA and final deadlines to split off new ERISA plans.

96.     On information and belief, DOL changed its interpretation of the Transition Relief deadlines and Form 5500 penalty enforcement without prior notice or consultation to the Tribe or other tribal governments.

97.     On information and belief, DOL's unannounced change in enforcement position applied the Form 5500 filing requirements unequally and in an *ex post facto* manner as:

- DOL targeted only tribes that attempted to file Form 5500s but were unable to satisfy all ERISA requirements. For example, tribes like the White Mountain Apache Tribe that filed a Form 5500 without an IQPA (because ERISA plan assets had not yet been split off under the Transition Relief).

- DOL was inconsistent on what it would accept as reasonable cause.

98.    In explaining DOL's decision to enforce penalties only against tribes that attempted to file Form 5500s in good faith prior to the Transition Relief deadlines, the DOL Chief Accountant, Ian Dingwall cavalierly responded as follows: "When you enter my world you are subject to my rules".

99.    The Tribe was denied sufficient discovery in WMAT I and WMAT II to secure additional information on DOL policies, practices, waivers, and enforcement actions in this regard.

## Ambiguity and Consultation

100.    Treasury representatives (during consultations) and the IRS Advisory Committee on Tax Exempt and Government Entities (the "ACT") report published on June 15, 2011, recognized ambiguity in the PPA and the need for further guidance.

101.    From 2006 through the last official consultation and comment periods in 2012, there were multiple consultation sessions conducted by Treasury and IRS, in which the Tribe participated directly and through counsel.

102.    During these meetings (and through written comments) tribal attendees raised issues of ambiguity and the need for constructive guidance under the PPA.  During the consultation sessions representatives from Treasury and IRS acknowledged ambiguity in how the PPA should apply to tribes, what was meant by "commercial" and "essential governmental functions", and that additional guidance would be needed for tribes with mixed plans *prior* to the final deadline for splitting off new ERISA-governed plans.

103.     Representatives from Treasury and IRS expressly informed tribal attendees that the PPA guidance project would include consultation under Executive Order 13175 and that compliance in the interim would be based on a good faith interpretation of the PPA.

104.     The ACT report, dated June 15, 2011, reiterated these ambiguities in the PPA and the need for additional guidance in order for tribes to comply with the new PPA requirements.

105.     The ACT also offered alternative interpretations of the PPA consistent with the interpretation urged by the Tribe in its administrative actions before the DOL.

106.     WMAT I and WMAT II improperly erred in finding no ambiguity, deferring to DOL's position, and failing to follow tribal canons of statutory construction.

107.     The Tribe was denied sufficient discovery in WMAT I and WMAT II to secure additional information on DOL consultation activities which, on information and belief, included discussions with Treasury regarding ambiguity and the need for additional consultation, tribal input, and guidance.

**Improper Characterization of "Willful" Disregard**

108.     DOL assessed penalties in part upon its incorrect characterization that the Tribe was willfully noncompliant.  However, DOL presented no credible evidence of willful non-compliance, and failed to contradict evidence of good faith offered by the Tribe, including the more than two decades of seeking guidance as noted above.

109.     The Tribe presented evidence to EBSA of good faith to support mitigation in both WMAT I and WMAT II, including without limitation, sworn declarations of the efforts that the Tribe had made and expense it had incurred in order to secure an IQPA, the difficulties that were encountered due to the Tribe's long history of maintaining a single plan, complicating factors as a result of the Tribe's use of shared employees and the frequent transfer of employees between

tribal entities, and technical issues that the Tribe's CPA firm had raised as a result of the lack of guidance in preparing an IQPA before assets were required to be split into ERISA and non-ERISA plans.

110.   The Tribe was denied sufficient discovery in WMAT I and WMAT II on DOL's allegations of willful non-compliance.

### Improper Application of Mitigation Regulations

111.   The ERISA reasonable cause regulation (29 CFR § 2560.502c-2(d)) contemplates penalty waivers upon compliance "or on a showing by the administrator of mitigating circumstances regarding the degree or willfulness of the noncompliance."

112.   On information and belief, DOL applied the foregoing regulation as if both compliance "and" mitigation were required.

113.   On information and belief, DOL applied the foregoing regulation as if willfulness could be presumed from non-compliance.

114.   On information and belief, DOL's actions were in violation of 29 CFR § 2560.502c-2(d).

### Trust Responsibility, Agency Deference to Tribes, and Consultation

115.   Executive Order 13175 establishes a framework for agencies to coordinate federal regulations with tribal governments.  The Order recognizes the unique legal relationship and trust relationship with Indian tribes, and the need to work with Indian tribes on a "government-to-government basis".

116.   The Executive Order contemplates that agencies "shall grant Indian tribal governments the maximum administrative discretion possible" and shall consult with tribal officials early in the process of developing any proposed regulation that has tribal implications.

117.     Section 6 of Executive Order 13175 directs agencies, including DOL, as follows:

(a) Agencies shall review the processes under which Indian tribes apply for waivers of statutory and regulatory requirements and take appropriate steps to streamline those processes.

(b) Each agency shall, to the extent practicable and permitted by law, consider any application by an Indian tribe for a waiver of statutory or regulatory requirements in connection with any program administered by the agency with a general view toward increasing opportunities for utilizing flexible policy approaches at the Indian tribal level in cases in which the proposed waiver is consistent with the applicable Federal policy objectives and is otherwise appropriate.

(c) Each agency shall, to the extent practicable and permitted by law, render a decision upon a complete application for a waiver within 120 days of receipt of such application by the agency, or as otherwise provided by law or regulation.  If the application for waiver is not granted, the agency shall provide the applicant with timely written notice of the decision and the reasons therefor.

(d) This section applies only to statutory or regulatory requirements that are discretionary and subject to waiver by the agency.

118.     DOL has also elected to limit its discretion when addressing issues of impact to Indian tribes through its own consultation policy, which includes similar requirements to those set forth in Executive Order 13175.  For example, the DOL consultation policy commits to "open and transparent" communications and requires DOL to make "all practical attempts where appropriate to use consensual mechanisms for developing regulations, including negotiated rule making."   The DOL policy also confirms that "[w]hen a DOL agency or regional office determines that a proposed policy or action will have tribal implications...the DOL agency will have an affirmative responsibility to provide advance notice to the potentially affected Indian tribes at the earliest practicable time...."

119.     The Form 5500 filing requirements and penalties at issue are within the discretion of DOL and therefore subject to the waiver procedures of Executive Order 13175, as well as the separate DOL policy on tribal consultation.

120.    DOL has failed to consult with tribes on the PPA and has administered penalties inconsistent with Executive Order 13175, its own consultation policy, and its trust responsibilities and fiduciary obligations.

121.    DOL has violated its own consultation policy by adopting changes to the DOL Policy or Practice of non-enforcement and changing the manner in which Transition Relief is construed without notice or consultation, and by deciding to regulate tribes through enforcement rather than through consensual rulemaking.

122.    Regardless of whether these consultation policies provide an independent cause of action, they represent policy decisions to act with deference to tribes.  These policies also work to constrain discretion that DOL may otherwise have.  Failure to abide by an agency's internal policies is evidence of an abuse of discretion and arbitrary and capricious conduct.

### Additional Allegations in Support of Injunctive and Declaratory Relief

123.    The foregoing allegations present an actual and substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

124.    The Tribe's request for declaratory relief is based on the existence of a judicially remedial right.

125.    Breaches of the Tribe's sovereign rights and its entitlement to government-to-government relationship with the United States cannot be remedied by monetary damages alone.

126.    Declaratory and injunctive relief will serve a useful purpose in clarifying and settling the legal relations at issue.  It will terminate controversies between the Tribe and DOL,

as well as afford relief from the uncertainty and controversy faced by the parties and other Indian tribes.

127.    Declaratory and injunctive relief in the Tribe's favor is in furtherance of public policy.

## **FIRST CAUSE OF ACTION**
**(Refund of Statutory Penalties - ERISA Section 502(c)(2))**

128.    The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

129.    Section 502(c)(2) of ERISA, 29 U.S.C. § 1132(c), authorizes the DOL to assess civil penalties for a plan administrator's failure or refusal to file annual reports required by ERISA [referred to in this Complaint as "Form 5500"].

130.    Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes the Tribe to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

131.    Section 502(k) of ERISA, 29 U.S.C. 1132(k) further authorizes the Tribe to file a civil action to "review a final order of the Secretary, to restrain the Secretary from taking any action contrary to the provisions of this chapter, or to compel him to take action required under this subchapter... in the United States District Court for the District of Columbia".

132.    Per 29 CFR § 2560.502c-2(b), the amount assessed under Section 502(c)(2) "shall be determined by the Department of Labor, taking into consideration the degree and/or willfulness of the failure or refusal to file the annual report."

133.    Per 29 CFR § 2560.502c-2(d), DOL may waive or reduce Section 502(c) penalties upon compliance "or on a showing by the administrator of mitigating circumstances regarding the degree or willfulness of noncompliance."

134.    Per 29 CFR §§ 2560.502c-2(e) and (g), the administrator must provide a timely statement of reasonable cause and the DOL must then review "all the facts alleged in support of no assessment or a complete or partial waiver of the penalty".

135.    In administering penalty assessments and waivers under ERISA, the DOL was required to take into account the government-to-government relationship between the Tribe and the United States, including those duties referred to in Executive Order 13175, DOL consultation policies, and those arising out of the federal trust responsibilities and/or common law duties and obligations owed by the United States to the Tribe.

136.    In administering Section 502(c)(2), the DOL owes a duty to administer the laws equally and consistently, including application of its Policy or Practice of non-enforcement.

137.    In administering Section 502(c)(2), the DOL must comply with the Administrative Procedures Act, due process and equal protection of the laws, and other such requirements to ensure proper rulemaking.  DOL was required to provide the Tribe notice of PPA requirements before enforcement, and prior notice of changes to the deadlines and other conditions for Transition Relief.

138.    In interpreting the PPA and in turn administering Section 502(c)(2), the DOL was required to coordinate Transition Relief and consultation efforts with Treasury. *See, e.g.*, 29 U.S.C. § 1204.

139.     The Tribe has exhausted all required administrative remedies under WMAT I and WMAT II, and the DOL penalty assessments in each case are final orders ripe for judicial review.

140.     For the reasons set forth above, DOL has violated the foregoing laws, regulations, and duties.

141.     As a direct and proximate cause of DOL's improper conduct, the Tribe has suffered damages equal to $140,000 in Section 502(c)(2) penalties improperly assessed and paid. The Tribe is entitled to reimbursement of these payments.

142.     The Tribe is also entitled to attorney's fees under ERISA Section 502(g), 29 U.S.C. Section 1132(g).


**SECOND CAUSE OF ACTION**
**(Injunctive Relief - ERISA Sections 502(a)(3))**

143.     The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

144.     Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes the Tribe to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan".

145.     Section 502(k) of ERISA, 29 U.S.C. 1132(k) further authorizes the Tribe to file a civil action to "review a final order of the Secretary, to restrain the Secretary from taking any action contrary to the provisions of this chapter, or to compel him to take action required under this subchapter... in the United States District Court for the District of Columbia".

146.    The DOL has and continues to misinterpret "essential governmental functions" and "commercial activities" in the PPA and Section 3(32) of ERISA.  Without limitation, DOL has applied these terms contrary to the manner in which these terms are applied to state and local governments, and DOL has violated the required tribal canons of construction requiring ambiguity to be resolved in favor of tribes.

147.    The DOL has and continues to impose requirements under ERISA in violation of the Transition Relief and its rulemaking duties under ERISA and the APA.

148.    The DOL has breached ERISA by violating its rulemaking and consultation duties under Executive Order 13175 and its own consultation policies.

149.    The DOL has and continues to enforce ERISA against tribes in an inconsistent, arbitrary and capricious manner.  Without limitation, DOL has applied inconsistent reasonable cause standards to tribes, and has inconsistently applied its Policy or Practice of non-enforcement.

150.    The DOL has denied the Tribe access to information needed to defend itself under ERISA and has violated its duties in assessing reasonable cause and mitigation under Section 502(c)(2).

151.    The DOL has denied the Tribe access to waiver rights required under ERISA.

152.    For the reasons set forth above, the Tribe seeks an Order enjoining DOL from such further breaches and violations of ERISA, and requiring DOL to consult with tribes in developing guidance under the PPA and ERISA including the definitions of "essential governmental functions" and "commercial activities", and the filing requirements for Tribes with mixed, commercial and/or governmental plans.

153.    The Tribe is also entitled to attorney's fees under ERISA Section 502(g), 29 U.S.C. Section 1132(g).

## THIRD CAUSE OF ACTION
### (Administrative Procedures Act)

154.    The Tribe incorporates all previous allegations of fact and law into this Cause of

Action.

155.    Under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 551 et seq.,

courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or

"without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

156.    DOL's wrongful acts and omissions as outlined above must be set aside as they

constitute an abuse of discretion and are otherwise not in accordance with the law.


**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff, the Tribe,

granting the following relief:

1.    Damages as requested in Count I equal to a refund of $140,000 in Section

502(c)(2) penalties, and interest therein, that have been improperly assessed.

2.    Injunctive relief as requested in Count II.

3.    An order setting aside the DOL's decisions in WMAT I and WMAT II.

4.    Declaratory relief in the form of the following Orders:

    a.    That unless the Transition Relief is modified with proper notice and comment, sponsors of mixed tribal plans are not required to file Forms 5500 and/or IQPAs until tribes and tribal employers are required to split off separate ERISA plans for commercial employees, six months following the issuance of final guidance under Section 906 of the PPA.

    b.    That plan sponsors who cannot come into compliance with EBSA filing requirements may nonetheless show mitigation for waiver or reduction of ERISA penalties.

    c.    That the terms "essential governmental functions" and "commercial activities" as used in the PPA are ambiguous.

    d.       That DOL is required to construe ambiguity in the definition of essential governmental functions and commercial activities in favor of tribes.

    e.       That to the extent the PPA terms "essential governmental functions" and "commercial activities" are not construed in favor of Indian tribal governments and in a manner consistent with the treatment of state and local governments, such terms are unconstitutional.

    f.       That functions and activities which are performed by state and local governments to raise revenue for public purposes shall not be treated as commercial activities when Indian tribal governments engage in the same or similar functions to raise revenue for public purposes.

    g.       That activities engaged in by tribes to raise revenue for public purposes rather than private interests are not "commercial" under the PPA.

    h.       That the commercial and governmental categories included in the Transition Relief are not binding for purposes of defining "essential governmental functions" and "commercial" activities under the PPA.

    i.       That DOL may not diminish tribal government status by policy or practice without engaging in consultation and rulemaking under the APA.

    j.       That DOL's acts and omissions as alleged above violated Section 906 of the PPA.

    k.       That DOL's acts and omissions as alleged above violated ERISA Section 502(c) and the regulations thereunder.

    l.       That DOL's acts and omissions as alleged above violated the Tribe's due process and equal protection rights under the United States Constitution.

5.       All costs, fees, and other damages as a result of Defendants' breaches (including those permitted under ERISA 29 U.S.C. §1132(g)); and

6.       Any and such other relief the Court deems proper.

DATE: May 27, 2020

s/Robert R. Yoder
Robert R. Yoder, Esq. (AZ0021)
YODER & LANGFORD, P.C.
4835 E. Cactus Road, Suite 260
Scottsdale, Arizona 85254
Telephone:  (602) 808-9578
Facsimile:  (602) 468-0688
robert@yoderlangford.com


Robert C. Brauchli, Esq.
(motion for admission *pro hac vice* pending)
P.O. Box 64607
Tucson, AZ 85728
rcbrauchli@rbrauchlilaw.com

Attorneys for the White Mountain Apache Tribe


<u>CERTIFICATION OF COMPLIANCE WITH ERISA</u>

A copy of the foregoing Complaint has been served upon the Secretary of Labor and
the Secretary of the Treasury by certified mail on this date as required by ERISA Section 502(h),
29 U.S.C. § 1132(h):


By: _____