## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WHITE MOUNTAIN APACHE TRIBE, a federally-recognized Indian tribe, 201 East Walnut Street, White River, Arizona 85941 <br><br> Plaintiff, <br><br> v. <br><br> JULIE A. SU, in her official capacity as Acting Secretary, United States Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210, <br><br> LISA M. GOMEZ, in her official capacity as Assistant Secretary, Employee Benefits Security Administration, United States Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210, <br><br> and <br><br> UNITED STATES OF AMERICA, c/o Attorney General of the United States Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-0001 <br><br> Defendants. | **Civ. A. No. 20-1409 (ACR)** |

## SECOND AMENDED COMPLAINT

Plaintiff makes and files this Second Amended Complaint against Defendants and alleges as follows:

## THE PARTIES

1.     Plaintiff, White Mountain Apache Tribe (the "Tribe" or "Plaintiff"), is a federally-recognized Indian tribal government.  Plaintiff is the sponsor and plan administrator of the White Mountain Apache Tribe Retirement Savings and 401(k) Plan (the "Plan").  The Tribe is located in Whiteriver, Arizona, on the Fort Apache Indian Reservation ("Reservation").  The

address of Plaintiff's Tribal Administration Office is: 201 East Walnut Street, Whiteriver, Arizona 85941.

2.      Defendant, the Honorable Julie A. Su, is the Acting Secretary of the United States Department of Labor ("DOL"), and successor to Eugene Scalia, prior Secretary of DOL, and is sued in her official capacity.  Acting Secretary Su has overall responsibility for carrying out all of the functions, duties and responsibilities of the DOL, including, without limitation, consultation with Indian tribal governments under Executive Order 13175 and DOL consultation policies, and regulatory and enforcement responsibilities under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").   These duties also include interpretation, administration, and enforcement of requirements applied to Indian tribal governments by ERISA Section 3(32) and Section 906 of the Pension Protection Act of 2006 (referred to herein as the "PPA").  The Secretary's office address is: U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

3.      Defendant Lisa M. Gomez is the Assistant Secretary of Labor for the Employee Benefits Security Administration ("EBSA"), and successor to Preston Rutledge, prior Assistant Secretary of Labor for EBSA, and is sued in her official capacity.  Assistant Secretary Gomez exercises authority delegated to her by the Secretary of Labor to carry out certain of the Secretary's responsibilities under ERISA, including those applied to Indian tribal governments and added by the PPA and other applicable law.  EBSA is the agency within DOL which is responsible, by way of example, for enforcement of annual filing requirements under Form 5500 and for penalty and enforcement actions that are the subject of this Complaint. References to DOL and EBSA shall include each other to the extent of shared responsibility and as necessary

to secure complete relief herein.  Her office address is: U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

4.      Defendant United States of America owes certain trust responsibilities and other duties to deal with the Tribe on a government-to-government basis, arising out of federal statute, Executive Orders and the federal common law.  The DOL and EBSA at all times herein were acting on behalf of the United States of America, and references to the DOL and EBSA shall include references to the United States of America as necessary to secure complete relief herein.

## JURISDICTION

5.      The Court has jurisdiction over this action, without limitation, pursuant to 29 U.S.C. § 1132(k) (review of final actions under ERISA), 5 U.S.C. §§ 702, *et. seq.* (the Administrative Procedure Act (the "APA"), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (injunctive relief), 28 U.S.C. § 2202 (declaratory relief), and 28 U.S.C. § 1362 (actions by Indian tribes).  Plaintiff's claim arises under the Constitution and laws of the United States, including ERISA, the APA, and the trust obligations and responsibilities of the United States to Indian tribes.  An actual justiciable controversy exists between Plaintiff and Defendants arising under the Constitution, laws or treaties of the United States.

6.      Venue is proper pursuant to 29 U.S.C. § 1132(k), which expressly grants jurisdiction and venue for the review of final orders of the Secretary under ERISA in the United States District Court for the District of Columbia, and 28 U.S.C. § 1391(e), because Defendants are being sued in their official capacity, were acting on behalf of the United States in respect to the allegations of this Complaint, and reside within this judicial district.

## INTRODUCTION AND STATEMENT OF THE CASE

7.     This case implicates fundamental issues of tribal sovereignty regarding what are considered tribal "essential governmental functions" and tribal "commercial" activities, as these terms remain undefined since being added as new requirements to ERISA in 2006.

8.     This case will decide whether a sub-agency within the Department of Labor, without any mandate or expertise in addressing Indian policy, has overstepped its bounds by making *ad hoc* decisions that an Indian tribal government is not acting "governmental", by "changing the rules" without notice and contrary to the APA, federal Indian law, and agency policy, and by imposing retroactive requirements that are impossible for the Tribe to meet.

9.     The DOL initially agreed not to require certain filings for tribal "commercial" plans until after regulatory guidance and definitions were developed through interagency efforts with Treasury and government-to-government consultation with tribes, but then unilaterally reversed course without warning.  In this case, the White Mountain Apache Tribe looks in part to the Supreme Court's decision in *Kisor v. Wilkie* for confirmation that "a court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties" particularly where "the agency has no comparative expertise in resolving a regulatory ambiguity".  139 S. Ct. 2400, 2417-18 (2019).

10.     The Tribe challenges DOL's change in position on tribal reporting, and its decision to refuse consultation on regulatory guidance in light of DOL's own voluntarily decision to limit its discretion through direct communications with the Tribe, and by adopting consultation and reporting policies that the Tribe relied upon to its detriment.

11.     The Tribe disagrees with the DOL that its decisions in this case are unreviewable, and that DOL's prosecutorial discretion can be used as a means to avoid any review of the final

agency actions in this case.  The Tribe contends that the conduct of DOL can and must be judged against meaningful standards including violations of DOL's own implementing regulations, DOL's decision to change its policy on tribal reporting without notice, and violations of policies and practices through which DOL voluntarily limited its discretion and provided standards by which its conduct could be judged.

12.     The Tribe further contends that DOL failed to apply long-standing Indian canons of construction, and failed to coordinate with the Department of Treasury in violation of ERISA and its own policies and agreements.

13.     In this action, the Tribe seeks a refund of One-hundred Forty Thousand Dollars ($140,000) in "commercial" based penalties it has already paid under ERISA Section 502(c)(2), as well as declaratory relief protecting the Tribe from future assessments and ensuring that tribal governments will not be held liable for complying with standards before they are announced, or that require actions that are impossible to take.

## PROCEDURAL BACKGROUND

14.     The Tribe filed its initial Complaint on May 27, 2020, after exhausting administrative remedies and securing two final agency decisions.

15.     The Tribe filed its First Amended Complaint challenging the administrative decisions and agency actions, on October 6, 2020.

16.     The DOL served a Rule 12(b) motion to dismiss on the Tribe on December 8, 2020.

17.     The Tribe responded to the motion and requested an opportunity to file an amended pleading to address certain arguments more fully.

18.     Oral argument was heard on the DOL's motion by the Honorable, Judge Florence Pan on January 20, 2022.

19.     A decision on the DOL's motion to dismiss was not issued as Judge Pan granted the Tribe's request to file this Second Amended Complaint, and allowed the parties an extended period to address resolution alternatives.

20.     By Order dated June 23, 2023, the Court provided the Tribe through July 3, 2023 within which to file its Second Amended Complaint.

## GENERAL ALLEGATIONS

21.     At all times relevant to this Complaint, DOL and EBSA (collectively referred to herein as "DOL" unless otherwise noted) are or were acting on behalf of the United States of America.

22.     DOL is charged with certain enforcement and regulatory responsibilities with regard to ERISA and the PPA, certain functions of which are delegated to EBSA. DOL remains responsible for those delegations.

23.     The United States Department of the Treasury ("Treasury"), in part through the Internal Revenue Service (the "IRS"), and the Pension Benefit Guarantee Corporation (the "PBGC") share certain responsibilities with DOL for certain enforcement actions and regulation of ERISA.

24.     On information and belief, DOL, Treasury and PBGC work together in the establishment of regulations and guidance under ERISA, particularly where compliance requirements overlap between the three agencies. *See, e.g.*, 29 U.S.C. §§ 1201, 1204, 1136; Memorandum of Understanding Internal Revenue Service / Department of Labor Coordination Agreement, June 3, 2003; Reorganization Plan No. 4 of 1978; Memorandum of Understanding

Among the U.S. Department of the Treasury, the U.S. Department of Labor, and the U.S. Department of Health and Human Services, April 21, 1999.

25.     This action pertains primarily to identical and overlapping requirements added to ERISA and the Internal Revenue Code (the "Code") by Section 906 of the PPA.  Specifically, the PPA added identical language to ERISA Section 3(32) and Code Section 414(d) clarifying that certain Indian tribal government Plans are to be treated as "governmental plans" under ERISA and the Code; provided that they cover employees performing "essential governmental functions" that are not "commercial" in nature.

26.     Treasury promptly issued transition relief for tribal governments in the form of two notices, Notice 2006-89 and Notice 2007-67 (the "Transition Relief"), in recognition that these terms were not defined in ERISA, that changes would require new guidance, and that it would take tribal governments time to amend plans to split off "commercial" employees once definitions and guidance were developed.

27.     The Transition Relief provided, in part, an extended deadline for tribal governments to split off new "commercial" plans to a date that is six months after guidance is issued.

28.     The Transition Relief also included employment categories ("Deemed Employees") initially referenced in the Joint Committee on Taxation's ("JCT") summary of the PPA as an interim "good faith" guide for determining "commercial" employees for purposes of the Transition Relief.

29.     Neither the Transition Relief nor the Deemed Employee categories were intended to establish final rules on what was an "essential governmental function" or a "commercial"

activity. Nor did the Transition Relief address operational compliance requirements that were to be developed through rulemaking including consultation, notice and comment.

30.     Neither Treasury nor DOL have issued any regulations or other guidance adopting the Deemed Employee categories as a final rule for determining commercial status under ERISA, the Code or the PPA.

31.     The deadline for tribes to split off commercial plans under the Transition Relief has not yet expired.  Throughout this Complaint, Plaintiff refers to the period from the enactment of the PPA in 2006 through the date that commercial plans must be split off or established following final guidance under the PPA as the "Transition Period".

32.     In applying the Transition Relief, the Tribe has consistently reserved its right to assert government status for all employees (including those Deemed Employees treated as commercial for purposes of the Transition Relief) based on final guidance under the PPA.

33.     The establishment of separate governmental plans and commercial plans for tribal governments is important because these plans are subject to compliance requirements under both ERISA and the Code.

34.     The case at bar deals primarily with reporting requirements that apply to commercial plans, and for which DOL and Treasury share a common annual report ("Form 5500") to satisfy both Treasury and DOL compliance. Administrators of commercial plans must file Form 5500s as a combined form for both DOL and Treasury compliance.

35.     DOL also requires certain ERISA plans under its jurisdiction to attach an Independent Qualified Public Accountant's report (an "IQPA") to the Form 5500, which provides additional information unique to ERISA.

36.     Administrators of governmental plans are exempt from both Treasury and DOL Form 5500 filing requirements.  Governmental plan assets are also exempt from the requirements of an IQPA.

37.     Neither the Transition Relief nor any other guidance from IRS or DOL purports to require Form 5500 filings at all during the Transition Period.

38.     Both IRS and DOL share authority to assess penalties for failure to file a Form 5500.

39.     However, in order to properly complete a Form 5500 the Tribe must also meet operational compliance requirements that require standards that have not yet been developed.  In particular, the PPA created for the first time an employer class (Indian tribal governments) that may be subject to different rules (government *versus* commercial) at the same time, depending on what functions an employee may perform at any given time.  Moreover, employee functions may change from time to time.

40.     Even if there were agreement on what a "commercial" employee was, there is no guidance yet on how to coordinate application of ERISA and government sector rules to the same employer.  This affects operational requirements for both the Code and ERISA and makes it impossible for the Tribe to complete the filings in a manner that DOL now demands.

41.     In fact, the filing of an IQPA would be impossible without additional guidance from DOL.  For example:

- Neither agency has published guidance defining what employees must be included in a commercial plan subject to reporting.

- DOL has not issued guidance on how a tribe can report on a commercial plan before it is split off or established.

- DOL has not provided guidance on how to report on the initial year of plan assets after split from a governmental plan or whether CPAs may use a "fresh start" for the initial reporting year post-PPA.

- There is no guidance on how to address "shared" employees who may have different functions for different tribal enterprises or government departments, employee functions and job descriptions that change mid-year, or how to address transfers between commercial or government plans for employees who change positions.

- There is no guidance on how to account for plan loan compliance for employees who participate in two plans of the same employer (commercial and government) depending on what functions they perform for multiple tribal entities.

- There is no guidance on how nondiscrimination testing is to be performed or coordinated between commercial and government plans sponsored by the same employer.

- There is no guidance on how to account for common or comingled trusts with both government and commercial assets.

- Until the PPA, there was no need to address transfers into or out of ERISA status plans sponsored by the same employer.

- Moreover, transfers required to meet DOL/ERISA government plan definitions will require compliance with Code transfer rules that will require new guidance.

- All of these requirements affect assets reported on an IQPA and all will require coordination between DOL and Treasury.

42.     Despite the lack of any PPA guidance requiring Form 5500 filings during the Transition Period, the Tribe filed what it could in good faith, and provided an explanation of what it was not able to file pending guidance under the PPA.

43.     On information and belief, EBSA has accepted other tribal government filings without looking to whether those plans actually met operational requirements.  On information and belief, DOL is holding the Tribe to a higher (impossible) standard.

44.     The IRS has not challenged the Tribe's Form 5500 filings for the 17 years since enactment of the PPA.  However, DOL has assessed the Tribe One Hundred Forty Thousand Dollars ($140,000) in Form 5500 reporting penalties for failure to include an IQPA.

45.     At all times relevant to this Complaint, DOL and Treasury are executive agencies of the Federal government.

46.     Prior to the enactment of the PPA, DOL and Treasury were under a duty to consult with Indian tribal governments on a government-to-government basis in the development of guidance on the status of Tribes as governments under ERISA and the Code.

47.     Following the enactment of the PPA, DOL and Treasury have been (and remain) under a duty to consult with Indian tribal governments on a government-to-government basis in the development of guidance on the status of Tribes as governments or commercial entities under the PPA.

### Good Faith Efforts to Secure Guidance
### on the Treatment of Indian Tribes under ERISA

48.     The Tribe began in good faith seeking guidance in the 1990s as to whether its retirement Plan was entitled to governmental plan status or should be structured under the private sector ERISA rules.

49.     On October 26, 1995 and then again on March 12, 1999, the Tribe received favorable determination letters (the "Determination Letters") from IRS approving its Plan under the government plan rules. The 1999 letter states in part that "[t]his plan is a governmental plan."

50.     The Plan covered tribal employees working in the government administrative offices, as well as those working for tribal enterprises, and just like many State and local government plans, distinctions were not drawn based on the activities performed by individual participants in the Plan.

51.     The DOL has since minimized the Tribe's good faith reliance on these Determination Letters even for periods prior to the PPA, incorrectly asserting that it has always been clear that tribes are not "governments" under ERISA or the Code, that determination letters are in any event from IRS rather than DOL, and that determination letters are limited to information provided by the Tribe during the application process.

52.     In reality, the issuance of determination letters is expressly coordinated between the two agencies, and Treasury must require an applicant to provide all "such other material and information [before issuing a determination letter] as the Secretary of Labor may require…." ERISA Section 3001, 29 U.S.C. § 1201.  The DOL also has statutory comment rights under ERISA on determination letter applications, including the ability to intervene in certain declaratory judgment actions when deemed necessary by the DOL.  *Id.*

53.     In addition to the IRS view of tribal governments as "governments" for purposes of pension laws as expressed in the Determination Letters received by the Tribe, the Pension Benefit Guaranty Corporation (also with jurisdiction under ERISA) had similarly found at least one tribal plan exempt from the private sector rules prior to the PPA.  PBGC Opinion 81-3, March 4, 1981.

54.     To resolve any doubt as to the government status of tribes, from 2003 through 2006, the Tribe engaged in efforts to secure legislation consistent with the favorable Determination Letters it had received.

55.     During this period, several bills were introduced in Congress to ensure equal government status for tribes with regard to tribal pension plans. *For example*, H.R. 3605, November 21, 2003, S. 2831, September 22, 2004, S. 673, March 17, 2005 and H.R. 331, January 25, 2005.  No tribal pension bills introduced during that period included any language evidencing Congressional intent to treat tribal "commercial" and "governmental" functions differently.

### Enactment of the Pension Protection Act of 2006

56.     In August of 2006, the PPA was signed into law and included the following language:

> The term "governmental plan" includes a plan which is established and maintained by an Indian tribal government (as defined in section 7701(a)(40) of title 26), a subdivision of an Indian tribal government (determined in accordance with section 7871(d) of title 26), or an agency or instrumentality of either, and all of the participants of which are employees of such entity substantially all of whose services as such an employee are in the performance of essential governmental functions but not in the performance of commercial activities (whether or not an essential government function)

57.     The undefined "essential governmental functions" and "commercial activities" requirements did not appear in any underlying bill.  These were added only during the conference committee process.

58.     There were no floor debates or other evidence of any Congressional consideration of these terms as the bill was pulled from conference committee early and voted on without debate prior to recessing for the 2006 election cycle.

59.     While DOL has since attributed considerable weight to "commercial" activity examples offered in the JCT explanation of the PPA, that explanation was not drafted by Congress, and it was not published until *after* Congress had already enacted the PPA.  Thus, it cannot be afforded legislative intent.

60.     Contrary to DOL's position in this case, there is no indication of what Congress meant by "essential government functions" or "commercial" activities, and these terms are susceptible to conflicting yet equally reasonable interpretations – the cornerstone of ambiguity.

61.     Treasury has struggled without success for decades trying to establish similar standards and definitions under the Indian Tax Status Act, 26 U.S.C. § 7871.

62.     The United States Supreme Court has also struck down similar regulatory efforts directed at "proprietary" functions (similar to "commercial" functions) as futile (*see, e.g., Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 541-542 (1985)).

63.     The IRS Advisory Committee on Tax Exempt and Government Entities (the "ACT") published a report on June 15, 2011 (*see infra*) outlining the sparse legislative history to the PPA and recognizing ambiguity and the need for further guidance.

64.     Consultation sessions on the PPA coordinated through DOL, Treasury, and IRS over a 17 year period have also failed to produce consensus on the multiple and conflicting proposed definitions of these terms.

65.     The litigation position that DOL takes that these definitions are "common sense" and clear on their face, is contrary to agency concessions and consultations during the 17 years since enactment of the PPA.  It is also contrary to EBSA's initial adoption of the Transition Relief and its initial agreement on the need for consultation and development of guidance (positions DOL ultimately changed without notice).

**Good Faith Efforts to Secure Guidance Following the PPA; Transition Relief**

66.     On information and belief, all agencies charged with responsibility over ERISA (DOL, IRS, Treasury, and PGBC) struggled to develop and agree on how to define tribal

governments under the changes added by the PPA, as well as guidance on operational compliance.

67.     On information and belief, each agency acknowledged and agreed that the terms "essential governmental functions" and "commercial" activities were ambiguous and in need of further guidance before tribes would be subject to enforcement actions for their commercial plans and before tribes would be required to split off or establish new commercial plans.

68.     On information and belief, each agency acknowledged and agreed that tribes would need additional guidance on operational compliance before tribes would be subject to enforcement actions for plans and before tribes would be required to split off or establish new commercial plans.

69.     On information and belief, while Treasury took a lead role in initiating Executive Order 13175 consultation with tribes on the PPA, these efforts were coordinated with and on behalf of agencies with shared responsibility under ERISA, including DOL.

70.     On information and belief, DOL had agreed with the Transition Relief, including the need for guidance, consultation, and extended deadlines for splitting off or establishing new commercial plans.

71.     Consultation was in fact initiated with tribes from 2006 through 2012. Many oral and written comments were provided by tribal governments, associations, and organizations during this period explaining why enterprise activities designed to produce funds for public purposes should not be considered "commercial", and explaining the difficulties and expense in maintaining split plans.

72.     Tribes and the agencies also exchanged and agreed on examples of operational compliance issues that would require new guidance. For example, how to address "shared

employees" working for multiple tribal government or commercial entities, how to address mid-year changes in job duties, how to address transfers between commercial and government plans, how to address employees with accounts in two or more plans of the same employer, how to address common or comingled trusts with government and commercial assets, and how to coordinate compliance testing.

73.     The Tribe participated in these PPA consultation efforts, including the preparation of comments.

74.     The Tribe, through counsel, for example, consulted with Treasury in May through August of 2007 regarding requests to extend good faith relief for Tribes pending guidance under the PPA.  These cooperative efforts ultimately led to the publication of Notice 2007-67, and joint efforts to coordinate consultation meetings with the National Congress of American Indians and the Native American Finance Officers Association on Notice 2007-67 and the need for further guidance under the PPA.

75.     In January of 2008, the Tribe, through counsel, reached out to Treasury for direction on technical compliance requirements under the PPA, and confirmation of the "good faith" standard and Transition Relief.   Treasury confirmed at the time that they were coordinating guidance with DOL and PBGC.

76.     On April 30, 2008 (before any enforcement actions against the Tribe) the Tribe, through counsel, wrote to five of the then top officials within Treasury and IRS specifically asking for consultation and relief under Executive Order 13175 on behalf of the White Mountain Apache Tribe and reiterating its then 20-year history in seeking guidance on pension compliance.

77.     A written decision on the Tribe's April 30, 2008 request was not issued, but a call was conducted on June 9, 2008 with various federal representatives believed to include William

Bortz, Christie Jacobs, Marty Pippens, Ingrid Grinde, Gwendolyn Prophet, and Andrew Zuckerman.  The call detailed several technical compliance issues that needed further guidance and presented challenges to Form 5500 filings, including:

- employee transfers;
- plan asset rules and distribution events;
- administering loans for employees participating in both governmental and commercial plans;
- service crediting rules (including control group testing and re-hire rules);
- remedial amendments periods;
- Qualified Domestic Relations Orders (QDROs);
- the definition of what is "operational" compliance required under the Transition Relief; and
- plan determination letters.

78.     The message from this meeting and broader consultation sessions at the time was clear: (1) more guidance was needed to address these technical, operational and reporting issues, (2) consultation would be conducted to consider tribal input in developing the guidance, and (3) tribes acting in good faith would *no*t be targeted for compliance deficiencies pending guidance. Moreover, the federal officials confirmed that these compliance and reporting issues were being coordinated with DOL and that DOL was in agreement with the agency approach that tribes were told they could rely upon.

79.     In August of 2008, the Tribe, through Plan counsel, reached out again for guidance specifically with regard to Form 5500 filing requirements.   In the ensuing conversations with agency officials (including William Bortz and Diane Bloom) it was confirmed that there was no consensus on the precise requirements that should apply pending guidance, and that issuing PPA guidance had become increasingly challenging due to the need to coordinate input from tribes, Treasury, PBGC, and DOL. In the interim, the message was clear: "tribes would not be penalized before being told what was expected of them".

80.     In 2014-2016, additional efforts were made to initiate consultation with DOL and EBSA on PPA compliance and Form 5500 filing requirements, including DOL representatives Jeremy Bishop and Ali Khawar.

81.     On November 19, 2015, application of the PPA and reporting requirements were addressed to the then EBSA Chief Accountant, Ian Dingwall, by phone.

82.     Despite the foregoing efforts to secure guidance, no rules or guidance under the PPA was ever adopted requiring tribes to file Form 5500s and/or IQPAs during the Transition Period.

83.     On information and belief, Treasury served as the primary point of contact with tribes for and on behalf of DOL on transition guidance under the PPA for the periods noted above, and DOL agreed to be bound by Transition Relief and representations that tribes would not be penalized before being told what was expected of them.

84.     On information and belief, DOL participated with Treasury in developing the Transition Relief and agreed to abide by it, including (1) the extended dates for splitting off "commercial" plans, (2) that tribes would not be penalized before being told what was expected of them, and (3) that the Deemed Employee categories were not to be treated as a final rule on what would be considered a "commercial" or "governmental" function under ERISA.

85.     On information and belief, DOL agreed that the Transition Relief did not include requirements for Form 5500 filings or IQPAs.

**Good Faith Effort to Secure Guidance on Form 5500 Filings**

86.     The Transition Relief did not address whether tribes would need to file Form 5500s *before* having to split off or establish new commercial and governmental plans (referred to herein as a "split" or "spinoff").  In fact, there was no guidance on how such forms or associated

IQPAs could be prepared at all with governmental and commercial plan assets allowed to be comingled pending the issuance of final rules.

87.     The Tribe, through counsel, specifically raised the need for additional guidance on Form 5500 filings and whether they were required during the Transition Period.

88.     On information and belief, DOL was aware that many tribal plans covering Deemed Employees were under the impression that they were not required to file Form 5500s at all during the Transition Period.

89.     These issues were expressly raised through Treasury as the primary point of contact for PPA consultation, and in recognition that DOL and Treasury coordinate Form 5500 filing requirements as a joint return for the Code and ERISA.

90.     At no time did IRS or DOL issue any notice or other guidance indicating that Form 5500 filings would be required during the Transition Period.  No guidance on Form 5500 filing requirements for tribal plans post-PPA was ever issued.

91.     On information and belief, DOL was aware of inconsistencies and confusion on whether (or how) tribes needed to file Form 5500s during the Transition Period, but elected not to provide guidance.  For example:

- Some tribes with plans covering government and Deemed Employees did not file Form 5500s during the Transition Period at all, as tribes were not yet required to split off or establish new commercial plans.
- Some tribes with plans covering government and Deemed Employees filed Form 5500s but did not attach IQPAs, as commercial plan assets were not yet required to be split off separately.
- Some tribes with plans covering government and Deemed Employees filed Form 5500s and secured IQPAs based on combined government and commercial plan assets.
- Some tribes filed Form 5500s and IQPAs without resolving the operational compliance requirements that remain unresolved.

92.     On information and belief, some tribes also abandoned their government status plans due to the long absence of guidance and inaction by DOL.

93.     On information and belief, DOL did not issue any notice or other guidance indicating that Form 5500 filings would be required during the Transition Period because DOL agreed that such filings were not required under the Transition Relief, or were otherwise exempt during the Transition Period.

94.     Seventeen years after the PPA was enacted, the DOL has still not issued guidance confirming how an IQPA can be prepared before assets are split or new commercial trusts are formed.

95.     The guidance the Tribe did receive (*see infra*) confirmed that no IQPAs would be required during the Transition Period (DOL conversations with legal counsel in 2009; assurance during PPA consultations; and 2011 letter from DOL withdrawing penalties based on acceptance of Transition Relief deadlines).

### Tribe Makes Good Faith Filings

96.     Despite the absence of any direction from either IRS or DOL on the need to file Form 5500 filings during the Transition Period, the Tribe filed Form 5500s.  However, without certainty as to what employees would ultimately be deemed commercial, without yet having to split off assets into a separate commercial plan or trust, and without guidance on how to address compliance and operational issues referred to herein, it would have been impossible for the Tribe to include an ERISA compliant IQPA.

97.     The Tribe was transparent about its effort to comply and included express notices and explanations to both Treasury and DOL along with its Form 5500 filings explaining the lack of guidance under the PPA and that its filing was a good faith effort to show compliance with the

Transition Relief.  The Tribe also continued to reach out for further direction and through participation in ongoing consultation efforts as above-described.

98.    The Tribe has acted at all times in good faith.  None of the foregoing conduct could reasonably be construed as willful non-compliance.

## DOL Confirms that Tribes Will Not be Required To File IQPAs During The Transition Period

99.    In 2007, counsel for the Tribe engaged in discussions with IRS and Treasury on what became the second notice making up the Transition Relief (Notice 2007-67), including the need for guidance before Form 5500 filings could be completed with IQPAs.

100.    IRS and Treasury confirmed that while long-term solutions and guidance would take time, tribes acting in good faith would not be penalized for violating PPA rules until after tribal governments were provided notice of what rules would apply and how.

101.    During these discussions, IRS and Treasury specifically confirmed that the Transition Relief was being vetted for agreement by DOL so that there would not be different rules or positions by any of the agencies sharing responsibility for ERISA and the PPA.

102.    The federal government is also equally bound by representations from DOL, Treasury and / or IRS over statutes of shared responsibility, particularly where the status at issue required coordination between agencies with shared responsibility.  See, e.g., 29 U.S.C. 1204.

103.    On information and belief, DOL agreed to the Transition Relief and that it would not penalize tribes for Form 5500 filings or IQPA deficiencies during the Transition Period.

104.    On information and belief, DOL agreed to the Transition Relief and that Form 5500s would not be required during the Transition Period.

105.   On information and belief, DOL agreed to the Transition Relief and that IQPAs would not be required during the Transition Period.

106.   In 2009 (before any enforcement actions against the Tribe), counsel for the Tribe spoke with a Form 5500 specialist within the DOL, EBSA division, Ketrin Oravecz, regarding filing requirements for tribal plans and difficulties that tribes were having in securing an IQPA during the Transition Period.

107.   Ms. Oravecz specifically represented to the Tribe's legal counsel that tribes would not need to file an IQPA during the transition period.  She confirmed that tribes would not be penalized during the Transition Period for failing to include an IQPA.  She stated that DOL understood and agreed with the difficulty that tribes were having in securing an IQPA and the need for additional guidance.  Ms. Oravecz specifically confirmed that DOL was following the extended deadlines under the Transition Relief, and would not require IQPAs or assess penalties until after the date that tribes are required to split off or establish new commercial plans.  Ms. Oravecz confirmed that EBSA could change this position following guidance.

108.   On information and belief, the positions expressed by Ms. Oravecz were consistent with official positions of DOL/EBSA that were authorized within its highest ranks.

109.   In fact, the Tribe ultimately secured copies of several EBSA memos corroborating these official positions.

110.   In an official EBSA memo dated October 5, 2009, EBSA Reporting Compliance Specialist, Ketrin Oravecz, concluded that a Form 5500 filed by another tribe without an IQPA was satisfactory and that:

> a filing was not required for this plan because [the] Plan qualified under two IRS notices (IRS Notice: 2006-89 and 2007-67) that give Indian Tribe entities additional time to separate the commercial part of their function from the

governmental function.  Case being closed with approval from Barbara Briley on 10/2/2009.

111.    In an official EBSA memo dated April 11, 2012, another EBSA reviewer found the same grounds sufficient to justify a full withdrawal of penalties initially assessed against yet another tribe for failure to attach an IQPA to their Form 5500 filing.  The "No Enforcement Action Taken" memo notes that "[i]t has been OCA's policy not to pursue cases against Indian tribes."

112.    Moreover, the DOL provided the White Mountain Apache Tribe itself direct assurance that it would not be subject to IQPA requirements pending guidance during the Transition Period.

113.    First, DOL/EBSA provided (through Ketrin Oravecz) assurances to the White Mountain Apache Tribe's legal counsel in 2009 regarding DOL's position that no IQPA filings would be required during the Transition Period.  Second, on August 1, 2011 (before the enforcement actions at issue in this case) the highest official within EBSA confirmed in writing that EBSA withdrew a penalty action for the White Mountain Apache Tribe based upon the extended deadlines set forth in the Transition Relief and the need for guidance.

114.    Moreover, the EBSA decision was not a waiver or determination based merely on mitigating factors, it was a complete withdraw.

115.    On information and belief the withdrawal was based on EBSA's conclusion that tribal IQPAs were not required at all during the Transition Period.

116.    In an official EBSA memo, dated July 19, 2011, other EBSA officials similarly documented their understanding that no IQPAs would be required during the Transition Period

with regard to the White Mountain Apache Tribe's plan, and documented factors relevant to the relief:

> The Tribe is a federally recognized Indian tribal government; the tribe has traditionally maintained a single 401(k) program for all government and enterprise employees.  With the enactment of Section 906 of the Pension Protection Act, however, the Tribe is not required to split "commercial" employees from the government plan in order for the Tribe to maintain its government plan status.  The actual date to split off the new enterprise plan into a separate document, however, has not occurred.

117.    While DOL now asserts that it is not bound by the foregoing, and characterizes its agreement to withdraw penalties as a "warning" or "opportunity" to get into compliance, this after-the-fact litigation position runs contrary to the facts at hand.  No one at DOL/EBSA expressed to the Tribe that the withdrawal of penalties in 2011 was a warning or opportunity to get into compliance.  The relief was based upon Transition Relief and extended deadlines that remain open to this day.

118.    Nor do any of the above-referenced EBSA memos mention a warning or opportunity to get into compliance when corroborating DOL's position that IQPAs were not required during the Transition Period and/or that penalties would not be assessed.  The memos simply refer to transition deadlines that remain open through this day.

119.    Nor did DOL/EBSA express a "warning" in 2009 when informing the Tribe's legal counsel that IQPAs would not be required during the Transition Period.  The discussion focused on the same Transition Relief and extended deadlines that are incorporated in each EBSA memo referenced herein.

120.    The Tribe's filing history also contradicts any litigation position that DOL may now take asserting alleged warnings or notice to change the way the Tribe had reported.  For nearly a half decade from 2006 through 2011, DOL never questioned a single filing by the White

Mountain Apache Tribe despite specific notices included by the Tribe with each filing explaining the Transition Relief and requesting consultation on any additional requirements DOL may deem necessary.

121.    After EBSA agreed to withdraw a penalty assessment in 2011 based on its acceptance of the Transition Relief, the Tribe continued to follow the same filing pattern as had been previously accepted for another three years by the time DOL changed course in 2014 without notice to the Tribe.

122.    The enforcement position taken by DOL leading to this case in 2014 was a clear change in DOL's position with regard to filings by the Tribe, in conflict with its long-standing policy that the Tribe need not file IQPAs during the Transition Period, and that penalties would not be assessed.  These changes were implemented with no advance notice to the Tribe, let alone guidance on how to comply or what to expect.  The terms "without notice" and "advance notice" and similar allegations throughout this Complaint refer to a lack of notice of change in rules to the Tribe, or through proper rulemaking under the APA, and /or notice after it was too late to alter filing positions in WMAT I, infra.

123.    As noted by the Supreme Court in *Kisor v. Wilke* (supra):

> A Court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties….We have therefore only rarely given *Auer* deference to an agency construction 'conflict[ing] with a prior' one.

## First Rejection of Reasonable Cause - Final Agency Action
## Case No 2015-RIS-00023 ("WMAT I")

124.    Almost three years after DOL agreed that the Tribe did not have to file IQPAs during the Transition Period and withdrew its 2011 penalty assessment based on the Transition

Relief, the Tribe received a new notice (dated September 15, 2014) questioning the lack of an IQPA.

125.    The Tribe provided the same explanations that were accepted in 2011 and expected them to be accepted as:

- There were no changes in guidance under the PPA since 2011.
- The Tribe was still not required to split off or establish a new commercial plan under the Transition Relief extended deadline.
- The Tribe still maintained comingled assets as permitted under the Transition Relief.

126.    However, this time EBSA rejected the Tribe's statement of reasonable cause, claiming (contrary to the Tribe's own experience) that DOL never had a policy exempting tribes from IQPA reporting during the Transition Period and/or exempting them from penalties *pending guidance* under the PPA.   The DOL denied following the Transition Relief or its extended deadlines and assessed penalties of Fifty Thousand Dollars ($50,000) against the Tribe.

127.    The DOL's new position was viewed by the Tribe as an unfair surprise and without fair warning.  The Tribe also questioned how penalties could be assessed when it was impossible for the Tribe to comply without guidance.

128.    The Tribe filed a request for hearing and final administrative appeal to the DOL Secretary, in Case number 2015-RIS-00023 ("WMAT I"), resulting in a final administrative action adverse to the Tribe on May 28, 2019.   The Tribe thereafter timely paid the assessment subject to its right to seek a refund through litigation.  As a final agency action, the decision is ripe for review in this Court per 29 U.S.C. § 1132(k).

129.    The Tribe contends that the final administrative action was in error.  Without limitation:

- DOL's action contradicted its own policy and prior withdrawal actions with the Tribe that IQPA filings would not be required during the Transition Period.
- DOL failed to reconcile the impossibility of what they were asking the Tribe to do.  For example, there was no PPA specific guidance for CPAs to follow in issuing an IQPA for tribal plans.
- DOL violated duties under ERISA to coordinate with Treasury and other agencies that share responsibility for changes added by the PPA.
- DOL violated its own regulations by failing to consider the Tribe's degree of willfulness (*See* § 2560.502c-2: The amount assessed "shall be determined…taking into consideration the degree and/or willfulness of the failure….").
- DOL violated its own regulations by denying reasonable cause before (or without) reviewing facts specific to the Tribe (*See* § 2560.502c-2: Reasonable cause is to be determined "following a review of the facts alleged in support of no assessment or a complete or partial waiver….").
- DOL failed to apply the appropriate tribal law canon of construction requiring ambiguity in federal statutes to be construed in favor of tribes.
- DOL failed to decide summary decision in favor of the Tribe based on the legal arguments and statements of undisputed facts set forth in the Tribe's summary decision briefs filed in WMAT I;
- DOL erred in determining that there is no ambiguity with regard to "essential government functions" or "commercial" status.
- DOL erred by failing to consider facts in the Tribe's request for waiver, its showing of reasonable cause, and grounds for mitigation.
- DOL denied discovery needed by the Tribe to defend itself.
- DOL erred by accepting material facts by EBSA that were in dispute and contrary to evidence.
- DOL erred in its application of willful misconduct and mitigation.
- DOL failed to consider and distinguish its prior waiver for the Tribe, similar requests by other tribes on the same or similar grounds, and the impact of DOL's Policy or Practice of non-enforcement.
- DOL erred in refusing to consider the impact of Executive Order 13175 and the DOL tribal consultation policy.
- DOL erred in misconstruing the scope of the Transition Relief and/or by adopting parts of the rule while ignoring its limitations, the deadline for plan splits, and its commitment to tribal consultation and rulemaking under the APA.
- On information and belief DOL erred by failing to coordinate key PPA definitions and joint reporting requirements with the Department of Treasury.
- DOL failed to make an expeditious decision.
- DOL erred by failing to follow applicable regulations in considering reasonable cause or mitigating factors asserted by the Tribe.
- The review and appeal process deferred to EBSA and did not afford the Tribe a substantive review.

## Second Rejection of Reasonable Cause - Final Agency Action:
## Case No 2017-RIS-00007 ("WMAT II")

130.   While WMAT I was still pending, and before a final agency action in that case, EBSA opened a new case for subsequent year filings (referred to herein as "WMAT II").

131.   DOL assessed additional penalties of Ninety Thousand Dollars ($90,000) against the Tribe for the filings covered by WMAT II.

132.   The Tribe submitted a timely statement of reasonable cause and request for waiver of penalties, including grounds then pending on appeal in WMAT I, as well as additional grounds that were not fully addressed in WMAT I.

133.   On information and belief, WMAT II was assigned to the same reviewer that denied relief to the Tribe in WMAT I, Buries Nivens III, and DOL simply deferred to its earlier decision in summarily rejecting the Tribe's requests for waiver and grounds for mitigation.

134.   On information and belief the DOL did not take into account its earlier representations and policy that no IQPAs would be required during the Transition Period.

135.   On information and belief, the DOL did not provide a full and fair review of the Tribe's request for waiver of penalties or mitigation in violation of 29 CFR § 2560.502c-2.

136.   Without limitation:

- DOL's action contradicted its own determination that IQPAs were not required for tribal plans during the Transition Period.

- DOL's action contradicted its own policy determination (and prior representations) that filing without an IQPA would not result in penalties through the extended Transition Relief deadlines.

- DOL failed to reconcile the impossibility of what they were asking the Tribe to do.

- DOL violated duties under ERISA to coordinate with Treasury and other agencies that share responsibility for ERISA changes added by the PPA.

- DOL violated its own regulations by failing to consider the Tribe's degree of willfulness (*See* § 2560.502c-2: The amount assessed "shall be determined…taking into consideration the degree and/or willfulness of the failure….").

- DOL violated its own regulations by denying reasonable cause before (or without) reviewing facts specific to the Tribe (*See* § 2560.502c-2: Reasonable cause is to be determined "following a review of the facts alleged in support of no assessment or a complete or partial waiver….").
.

137.    On December 9, 2016, the Tribe filed a timely Answer and Request for Hearing, and WMAT II proceeded to summary decision with briefs due on May 28, 2019.

138.    After almost 2 1/2 years had passed since the Tribe filed its Notice of Appeal in WMAT I, the Tribe received a copy of the Secretary's adverse decision in that case, on the very same day that the Tribe's summary decision brief was due in WMAT II.

139.    This allowed the DOL to cite to the new decision in WMAT I during the then pending summary judgment briefing in WMAT II.

140.    The timing of the decision in WMAT I, as well as the assignment of WMAT II to the same EBSA reviewer that denied the Tribe's prior request for reasonable cause and mitigation brings into question the fairness and objectivity of the DOL review in both cases.

141.    On information and belief, the DOL intentionally timed its decision in WMAT I to influence the decision in WMAT II.

142.    On information and belief, the penalty review in WMAT II was assigned to the same EBSA staff member who had denied the Tribe's request in WMAT I for the purpose of securing the same outcome.

143.    The Tribe's appeal in WMAT II was ultimately denied citing to the WMAT I decision on July 22, 2019, and became a final agency action twenty days later.  The Tribe thereafter timely paid the assessment subject to its right to seek a refund through litigation.  As a final agency action, the decision is ripe for review in this Court per 29 U.S.C. § 1132(k) and the APA.

144.    The Tribe asserts error in WMAT II.  Without limitation, the Tribe asserts the same grounds for error asserted with respect to WMAT I, that the ALJ improperly decided summary decision based on the legal arguments and statements of undisputed facts set forth in the Tribe's summary decision briefs filed in WMAT II, and for the additional grounds set forth herein.

145.    The Tribe further asserts that the ALJ applied the wrong standard of review, and improperly limited the scope of his review by declining to adequately consider matters such as needed discovery, unequal treatment, due process, and the impact of Executive Order 13175 and other DOL policies.

146.    The Tribe asserts that the ALJ did not review facts relevant to the case, did not allow discovery of facts needed for a full decision on the merits, and incorrectly decided facts in favor of DOL that were unsupported by DOL evidence or testimony.

### DOL Agreed Not to Require IQPAs or Assert Penalties, and then Changed its Position Without Notice

147.    The DOL adopted a policy or practice of not requiring IQPAs during the Transition Period and/or not asserting IQPA-related penalties against tribes pending guidance under the PPA.

148.    The DOL policy or practice included withdrawal and/or waiver of penalties against tribes pending the deadline to split off or establish new commercial plans under the Transition Relief.

149.    On information and belief, DOL adopted and participated in the development of the Transition Relief.

150.    DOL construed the Transition Relief as providing relief to tribes from Form 5500 filing requirements and IQPAs during the Transition Period.

151.    DOL changed its policy or practice of providing relief from Form 5500 filing and IQPA requirements without notice or explanation to the Tribe or tribal governments generally, who relied upon, and had the right to continue to rely upon the unequivocally stated extension of time in the Transition Relief.

152.    On information and belief, DOL rescinded its former adoption of the Transition Relief without prior notice to the Tribe or other tribes.

153.    Instead of providing notice of the forgoing changes or guidance as to what was expected of tribes during the Transition Period, DOL denied that it ever had a policy or practice of not requiring IQPAs during the Transition Period and/or of not assessing IQPA-related penalties pending guidance under the PPA.  DOL also denied that it had adopted the Transition Relief.  On information and belief, these assertions by DOL are false.

154.    The DOL assertion is contrary to express DOL communications with the Tribe's legal counsel in 2009, contrary to EBSA internal memos, and contrary to DOL's treatment of the Tribe in 2011.

155.   On information and belief, this DOL position was developed as an after the fact litigation strategy with the hope that it cannot be challenged or exposed if DOL prevails on its position that DOL decisions are unreviewable and protected by prosecutorial discretion.

156.   As part of its litigation strategy, DOL also characterized the 2011 penalty withdrawal and other evidence of relief as a "warning" and "opportunity" to cure.  This assertion is false.

157.   DOL provided no communications in connection with its 2011 decision to withdraw penalties against the Tribe indicating that it was providing the Tribe a warning.  To the contrary, DOL fully accepted the explanation provided by the Tribe, including the Tribe's understanding that it was entitled to the extended Transition Relief deadlines.

158.   Nor did DOL provide any warnings to the Tribe's legal counsel in 2009, when DOL expressly acknowledged that IQPAs would not be required during the Transition Period and that DOL was honoring the Transition Relief extended deadlines.

159.   Nor do any of the internal EBSA memos referred to herein mention anything about providing tribes a warning, rejecting the Transition Relief, or that DOL would cut the Transition Relief deadlines short.

160.   On information and belief, DOL elected to amend its policy or practices regarding both no IQPAs being required during the Transition Period and no penalties being assessed, DOL rescinded its adoption of the Transition Relief or decided to ignore the Transition Relief extended deadlines, and DOL chose to engage in enforcement actions against tribes without prior notice, consultation, or benefit of a final rule.  This conduct violates ERISA, the APA and DOL's own consultation policy.

161.    DOL has successfully avoided discovery on the foregoing matters through an internal review process that is deferential to agency decisions (even with no expertise on tribal matters).  Nor has DOL had to admit or deny the allegations at hand.

162.    While the Tribe was aware of DOL's change in position in 2014 and by the time of WMAT II, the Tribe was not subject to final agency action as the change was being challenged by the Tribe on appeal and there was no time to adjust filings.  Nor did DOL issue guidance on how to do so.

### Unequal Treatment

163.    On information and belief, many tribes and tribal enterprises across the country reasonably elected not to file Form 5500s and/or IQPAs during the Transition Period as (1) the Transition Relief does not purport to require such filings, (2) there is no guidance on whether or how to file an IQPA on ERISA plan assets before there is a separate ERISA plan on which to file, (3) neither Treasury nor DOL enforced Form 5500 filing requirements until the unannounced change in DOL's policy or practice referred to herein, and (4) the enforcement actions taken by DOL have been inconsistent.

164.    On information and belief, both agencies elected not to enforce Form 5500 penalties for tribal plans pending guidance under the PPA and final deadlines to split off or establish new commercial plans.

165.    On information and belief, DOL changed its interpretation of the Transition Relief deadlines, IQPA requirements, and Form 5500 penalty enforcement policies without prior notice or consultation to the Tribe or other tribal governments.

166.    On information and belief, DOL's unannounced changes applied the Form 5500 filing and IQPA requirements unequally and in an *ex post facto* manner as:

- DOL targeted only tribes that attempted to file Form 5500s but were unable to satisfy all ERISA requirements. For example, tribes like the White Mountain Apache Tribe that filed a Form 5500 without an IQPA (because ERISA plan assets had not yet been split off under the Transition Relief).
- DOL was inconsistent on what filings were required.
- DOL was inconsistent on what it would accept as reasonable cause.

167.    On information and belief, DOL's selective representations to tribes on IQPAs not being required, as well as *ad hoc* decisions to withdrawal penalty actions has added to inconsistencies.

168.    On information and belief, DOL elected to require IQPAs and pursue enforcement actions only against tribes that attempted to file Form 5500s in good faith.

169.    On information and belief, DOL was aware of this unequal treatment and that only tribes who attempted to file in good faith were punished.  In explaining DOL's decision to enforce penalties only against tribes that attempted to file Form 5500s in good faith prior to the Transition Relief deadlines, the DOL Chief Accountant, Ian Dingwall cavalierly told the Tribe's legal counsel: "When you enter my world you are subject to my rules".

170.    The Tribe was denied sufficient discovery in WMAT I and WMAT II to secure additional information on DOL policies, practices, waivers, and enforcement actions in this regard.

## Ambiguity and Consultation

171.    DOL asserts in litigation that the terms "essential government function" and "commercial" activities as used in the PPA are clear "common sense" terms that are not ambiguous or in need of guidance or clarity.  On information and belief, this litigation position is inconsistent with DOL admissions and actions prior to defending this case.

172.    DOL asserts in litigation that the Tribe could have filed IQPAs before having to split off or establish new commercial plans, and without guidance or clarity on how to file for a trust with both government and commercial plan assets.  This litigation position is inconsistent with CPA standards that the Tribe should be able to present at trial.  This litigation position is inconsistent with DOL admissions and actions prior to defending this case.

173.    DOL's litigation position that there is no ambiguity is contradicted by years of agency-tribal consultation efforts where ambiguity was acknowledged, where multiple equally reasonable interpretations of the rules at issue in this case were offered and debated, and where no consensus was developed on the competing interpretations.

174.    Attendees during tribal consultations under the PPA (including the Tribe) were expressly informed that the PPA guidance project would include consultation under Executive Order 13175, that compliance in the interim would be based on a good faith interpretation of the PPA, and that there would be no unfair surprise in the form filing requirements or enforcement without guidance.

175.    DOL's litigation position that there is no ambiguity is contradicted by the 17 years that Treasury has been working on guidance and developing a consensus on what is meant by "essential government functions" and "commercial" activities in this context.

176.    DOL's litigation position that there is no ambiguity is contradicted by findings of the IRS Advisory Committee on Tax Exempt and Government Entities (the "ACT"), published on June 15, 2011, expressly recognizing ambiguity in the PPA and the need for further guidance.

177.    The ACT also offered alternative interpretations of the PPA consistent with the interpretation urged by the Tribe in its administrative actions before the DOL.

178.    Unlike DOL's current litigation position, these acknowledgements of ambiguity and the need for guidance (including from DOL itself) predated the enforcement actions at issue in this case.

179.    The DOL and ALJ decisions in WMAT I and WMAT II improperly erred in finding no ambiguity, deferring to DOL's position, and failing to follow tribal canons of statutory construction.

180.    The Tribe was denied sufficient discovery in WMAT I and WMAT II to secure additional information on DOL consultation activities which, on information and belief, included DOL's agreement with Treasury regarding ambiguity and the need for extended deadlines, additional consultation, tribal input, and guidance before enforcement.

181.    Discovery on these matters is required in order to assess compliance with 29 U.S.C. 1204.

### DOL has Violated its Own Mitigation Regulations

182.    The "mitigation regulations" at issue in this case (29 CFR 2560.502c-2(b)(1)) require the DOL to consider the degree and/or willfulness of any failure of refusal to file an annual report.  On information and belief, DOL did not do so.

183.    In an effort to satisfy this requirement after the fact, DOL asserts that "willful" under this regulation merely means "a voluntary act" requiring no ill motive or bad intent.

184.    On information and belief, this post-litigation interpretation of "willfulness" is wholly contrary to the manner in which DOL and other federal agencies (Treasury/IRS) have historically applied this term for purposes of penalty mitigation.

185.    Nor has DOL presented any credible evidence that it considered at all, let alone found any evidence of willful non-compliance.

186.    The fact that the Tribe relied on express representations from DOL itself that IQPAs were not required pending guidance under the Transition Relief forecloses any possible willful non-compliance.

187.    The Tribe also presented ample evidence (including sworn declarations) to EBSA of good faith efforts to support mitigation in both WMAT I and WMAT II.

188.    It was error for the ALJ to conclude that this regulatory requirement was met without requiring DOL to make even a minimal showing (not a single declaration) that it in fact considered these required factors in the face of well pled allegations to the contrary.

189.    The "mitigation regulations" at issue in this case (29 CFR 2560.502c-2(g)) require the DOL to conduct "a review of all the facts alleged in support of no assessment or a complete or partial waiver" and to issue its determination of penalties only "following" such review.  DOL did not do so in this case.

190.    On information and belief DOL did not conduct "a review of all the facts alleged in support of no assessment or a complete or partial waiver of the penalty" as required by 29 CFR § 2560.502c-2(g).

191.    The foregoing conduct by DOL violates 29 CFR § 2560.502c-2.

**Trust Responsibility, Agency Deference to Tribes, and Consultation**

192.    Executive Order 13175 establishes a framework for agencies to coordinate federal regulations with tribal governments.  The Order recognizes the unique legal relationship and trust relationship with Indian tribes, and the need to work with Indian tribes on a "government-to-government basis".

193.    The Executive Order contemplates that agencies "shall grant Indian tribal governments the maximum administrative discretion possible" and shall consult with tribal officials early in the process of developing any proposed regulation that has tribal implications.

194.    Section 6 of Executive Order 13175 directs agencies, including DOL, as follows:

(a) Agencies shall review the processes under which Indian tribes apply for waivers of statutory and regulatory requirements and take appropriate steps to streamline those processes.

(b) Each agency shall, to the extent practicable and permitted by law, consider any application by an Indian tribe for a waiver of statutory or regulatory requirements in connection with any program administered by the agency with a general view toward increasing opportunities for utilizing flexible policy approaches at the Indian tribal level in cases in which the proposed waiver is consistent with the applicable Federal policy objectives and is otherwise appropriate.

(c) Each agency shall, to the extent practicable and permitted by law, render a decision upon a complete application for a waiver within 120 days of receipt of such application by the agency, or as otherwise provided by law or regulation.  If the application for waiver is not granted, the agency shall provide the applicant with timely written notice of the decision and the reasons therefor.

(d) This section applies only to statutory or regulatory requirements that are discretionary and subject to waiver by the agency.

195.    DOL has also elected to limit its discretion when addressing issues of impact to Indian tribes through its own consultation policy, which includes similar requirements to those set forth in Executive Order 13175.  For example, the DOL consultation policy commits to "open and transparent" communications and requires DOL to make "all practical attempts where appropriate to use consensual mechanisms for developing regulations, including negotiated rule making."  The DOL policy also confirms that "[w]hen a DOL agency or regional office determines that a proposed policy or action will have tribal implications...the DOL agency will have an affirmative responsibility to provide advance notice to the potentially affected Indian tribes at the earliest practicable time...."

196.    The Form 5500 filing requirements and penalties at issue are within the discretion of DOL and therefore subject to the waiver procedures of Executive Order 13175, as well as the separate DOL policy on tribal consultation.

197.    DOL has failed to consult with tribes on the PPA and has administered penalties inconsistent with Executive Order 13175, its own consultation policy, and its trust responsibilities and fiduciary obligations.

198.    DOL has violated its own consultation policy by adopting changes to the DOL policy or practice of non-enforcement and changing the manner in which Transition Relief is construed without notice or consultation, and by deciding to regulate tribes through enforcement rather than through consensual rulemaking.

199.    Regardless of whether these consultation policies provide an independent cause of action, they represent policy decisions to act with deference to tribes.  These policies also work to constrain discretion that DOL may otherwise have.  Failure to abide by an agency's internal policies is evidence of an abuse of discretion and arbitrary and capricious conduct.

**Additional Allegations in Support of Injunctive and Declaratory Relief**

200.    The allegations herein present an actual and substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

201.    The Tribe's request for declaratory relief is based on the existence of a judicially remedial right.

202.    Breaches of the Tribe's sovereign rights and its entitlement to government-to-government relationship with the United States cannot be remedied by monetary damages alone.

203.   Declaratory and injunctive relief will serve a useful purpose in clarifying and settling the legal relations at issue.  It will terminate controversies between the Tribe and DOL, as well as afford relief from the uncertainty and controversy faced by the parties and other Indian tribes.

204.   Declaratory and injunctive relief in the Tribe's favor is in furtherance of public policy.

**The Tribe was in compliance with ERISA at the time of the assessments**

205.   The Tribe performed all actions required by the DOL for compliance with ERISA at the time of the assessments:

- DOL had waived Form 5500 filing requirements and/or IQPAs regardless of how DOL now interprets "commercial" or "essential governmental functions".
- DOL confirmed this relief from IQPA filing requirements in 2009.
- DOL confirmed in 2011 that the Tribe's Form 5500 filings were sufficient for ERISA compliance without an IQPA pending guidance through the Transition Period under the Transition Relief.
- ERISA Form 5500 filings and/or IQPAs were not required under the Transition Relief adopted and followed by DOL.
- Once DOL elected to adopt a policy or practice of relief from IQPA filing requirements and/or from penalties associated therewith, it had a duty under the APA, ERISA, Executive Order 13175 and its own consultation policy to make changes through proper rulemaking under the APA.

206.   The Tribe contends that all employees participating in its Plan were performing essential governmental functions that were not commercial in nature within the meaning of the PPA.

- All participants in the plan performed functions designated under tribal law as essential governmental functions.
- All participants in the Plan performed functions that were designated under tribal law as non-commercial.
- All participants in the plan performed functions designed by the Tribe to raise public funds solely for public governmental purposes.
- No participants engaged in activities that involved private interests.

- Characterizing such Tribal enterprise activities as "commercial" runs contrary to other Federal law, including the Indian Gaming Regulatory Act and the Tribal Self-Determination and Education Assistance Act.
- At the time of the assessments at issue in this case DOL had not ruled or provided guidance on any particular definitions of "commercial", and neither DOL nor Treasury indicated that the Deemed Employee rules were intended as a final rule.
- Ambiguity on the definitions at issue must be resolved in favor of the Tribe as a matter of federal law.

207.    In the event of a conflict between Tribal law and an agency interpretation, the agency must engage in consultation to address such conflicts.  DOL never consulted with the Tribe to resolve any conflicts between Tribal law and its interpretation of the PPA.

208.    Nor does ERISA preempt tribal law on such matters not directly addressed by ERISA itself.  Per 29 U.S.C. § 1144(a),  ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title."  The ERISA preemption provision does not mention tribal laws that relate to an employee benefit plan.

209.    Moreover, ERISA expressly limits DOL's discretion by providing that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d).  Under the federal Indian Gaming Regulatory Act (IGRA), and the regulations and rules thereunder, tribal gaming facilities (a Deemed Category) are expressly restricted in using gaming revenues for public / governmental purposes in a manner distinct from private commercial businesses.   On information and belief, DOL failed to take these differences into account.

210.    On information and belief, DOL failed to reconcile its position with participation of tribal gaming and other enterprises in the Federal Employee Health Benefit Plan, as governed by the Federal Employees Health Benefits Act, 5 U.S.C. § 8901, *et seq*.

211.    The Transition Relief categories relied upon by DOL in WMAT I and WMAT II were not intended to bind tribal governments with regard to what was an essential governmental function or a commercial activity for purposes of ERISA reporting requirements.

212.    In this litigation, DOL has cited to private litigation for the definition of tribal governments, where the interests of private litigants (not tribal governments or federal agencies) were at issue.  The Tribe asserts that DOL is duty bound to consider government-to-government policies and trust responsibilities in establishing agency policy and statutory definitions under the PPA that private litigants were not bound to follow.  On information and belief, DOL failed to do so.

213.    The Tribe alleges that (1) it's Plan fit within the governmental plan exemption of ERISA (Section 3(32)), (2) that it was nonetheless in full compliance with the ERISA reporting requirements accepted by DOL prior to the enforcement actions leading to this litigation (including the absence of an IQPA) and not changed by proper rule making, (3) that the Tribe demonstrated adequate mitigation, (4) that the DOL did not consider facts or willfulness as required by the mitigation regulations, and (5) that the assessed penalty amounts, therefore, exceed the statutory and regulatory limits.

214.    The Tribe has determined that it is in the best interest of the Plan and its participants to secure clarity on the PPA requirements at issue in this case.

215.    DOL is violating ERISA by exercising jurisdiction over the sponsor of a governmental plan (See, e.g., ERISA Section 4(b)(1), 29 U.S.C. § 1003(b)(1), and ERISA Section 3(32), 29 U.S.C. § 1002(32)).

216.    DOL is violating ERISA by administering Form 5500 penalties in violation of its implementing and mitigation regulations (See, e.g., 29 C.F.R §§ 2650.502c-2 and 29 C.F.R. §§ 2570.60-71 and 29 C.F.R. § 2570.60).

217.    DOL is authorized to grant relief or waive filing requirements for IQPAs under ERISA.  DOL has violated ERISA in this case by requiring IQPAs after representing to the Tribe that it did not have to file such reports.  While DOL could change that rule, such action requires DOL to follow proper rulemaking procedures and issue guidance explaining what must be filed and how.

218.    If DOL is not authorized to grant relief or waive filing requirements for IQPAs under ERISA, then DOL engaged in misrepresentations that merit estoppel.

219.    DOL has violated ERISA Section 506 and 3004, 29 U.S.C. §§ 1136 and 1204, by failing to coordinate its decision to rescind its adoption of the Transition Relief and the extended deadlines therein, without coordinating these changes with Treasury.

220.    ERISA Section 3004, for example, provides that "[w]henever in this chapter or in any provision of law amended by this chapter the Secretary of the Treasury and the Secretary of Labor are required to carry out provisions related to the same subject matter (as determined by them) they shall consult with each other and shall develop, regulations, practices, and forms…designed to reduce duplication of effort, duplication of reporting, conflicting or overlapping requirements, and the burden of compliance with such provisions by plan administrators, employers, and participants and beneficiaries."

221.    The definitions of governmental plan (duplicate under the Code and ERISA), reporting requirements (Form 5500 is shared between Treasury and DOL), and Transition Relief include Code and ERISA provisions related to the same subject matters.  DOL breached ERISA by its unilateral decision to reject the Transition Relief deadlines, to change its own policy of non-enforcement, and to engage in enforcement actions in lieu of consultation and guidance being worked on through Treasury.

222.    DOL is violating ERISA and the APA by applying the Form 5500 filing requirements to tribal governmental plans inconsistently and contrary to law.

223.    DOL is violating the APA and ERISA by changing its position on the Transition Relief without notice, comment or other procedural protections of the APA or ERISA.

224.    DOL constrained any rulemaking and prosecutorial discretion they may have otherwise had under ERISA by adopting tribal government consultation policies which provide *in part*:

- "DOL will continue to work with Indian tribes ... in a manner that respects tribal self-government and sovereignty, honors tribal treaty and other rights, and meets the Federal Government's tribal trust responsibilities."
- "Communication and exchange of ideas will be open and transparent."
- "The Department is committed to ongoing and continuous dialogue with Indian tribes [and c]onsultation is a critical key ingredient of a sound and productive federal-tribal relationship...."
- "In accordance with Executive Order 13175, when formulating and implementing policies that will have tribal implications, it is the Department's policy that, to the extent practicable and permitted by law, consultation with affected Indian tribes will occur.... [T]his refers to proposed legislation, regulations, policies, or actions that have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes."
- "Each DOL operating agency will have an accountable process to ensure meaningful and timely input by Indian tribes on policies or actions that have tribal implications."
- "The Department's operating agencies will review their existing tribal consultation and program administration practices, including those of their

-44-

regional offices, and revise them as needed to comply with the Department's policy as set forth in this document."

- "[T]o the extent practicable and permitted by law, prior to the promulgation of any regulation that has tribal implications and preempts tribal law, the DOL agency involved will...[n]otify and consult with affected Indian tribes early in the process...."
- "On issues relating to tribal self-governance, tribal self-determination, and implementation or administration of tribal programs, each DOL agency will make all practicable attempts where appropriate to use consensual mechanisms for developing regulations, including negotiated rulemaking in accordance with the Negotiated Rulemaking Act."
- "[N]o DOL agency shall promulgate any regulation having tribal implications that is not required by statute and imposes substantial direct compliance costs on tribal communities, unless ... [f]unds necessary to pay the direct costs incurred by Indian tribes in complying with the regulation are provided by the Federal Government [or p]rior to the formal promulgation of the regulation, the agency [] Consulted with Indian tribes early in the process of developing the proposed regulation...."
- "With respect to statutory or regulatory requirements that are discretionary and subject to waiver by DOL, each DOL agency will review the processes under which Indian tribes apply for waivers and take appropriate steps to streamline those processes as necessary."
- When reviewing any application for a waiver of regulatory requirements in connection with any program administered by a DOL agency, the agency will consider the relevant factors with a general view toward increasing opportunities for utilizing flexible policy approaches at the Indian tribal level in cases in which the proposed waiver is not inconsistent with the applicable federal policy and objectives and is otherwise appropriate as determined by the agency."
- "When a DOL agency or regional office determines that a proposed policy or action will have tribal implications...the DOL agency will have an affirmative responsibility to provide advance notice to the potentially affected Indian tribes at the earliest practicable time, but no less than 60 days prior to DOL's action."
- "[c]onsultation can involve any DOL matter having tribal implications, including but not limited to...rulemaking, regulations, policies, waivers and flexibility;...regulatory guidance; and other matters of tribal interest."
- "[A]t least one national tribal consultation meeting will be held by DOL each calendar year."

225.    On information and belief, DOL has violated each and every one of the above

policies by refusing to consult with tribes on guidance under the PPA, by applying and then

changing filing requirements, policies and practices referred to herein without notice or input,

and by failing to consider tribal policies and input in the manner in which it administers the filing and penalty waivers at hand.

226.    While the DOL consultation policy provides that "DOL has no obligation to engage in consultation activities under this policy unless they are practicable and permitted at law", the Tribe alleges that DOL has not and cannot make such a showing with regard to the PPA matters at issue in this case.

227.    While the DOL consultation policy provides that enforcement, planning, investigations, cases and proceedings are not appropriate subjects for consultation, the Tribe alleges that the policies and statutory interpretations applied by DOL against the Tribe are a direct result of DOL's failure to engage in consultation _before_ the WMAT I and WMAT II enforcement actions.

228.    While the Tribe does not argue that breach of the consultation policy is a breach of ERISA, the Tribe alleges the DOL constrained its discretion under ERISA by adopting consultation and other policies and practices referred to herein.

229.    DOL decisions to violate their own consultation and other policies and practices referred to herein, and make changes without notice, is evidence that DOL has abused the discretion it is afforded under ERISA.

230.    DOL's interpretation of the PPA government plan exemption (ERISA Section 3(32)), and its application of the Form 5500 filing, penalty waiver and mitigation rules (including 29 C.F.R §§ 2560.502c-2 and 29 C.F.R. §§ 2570.60-71) was influenced in part as a result of its failure, as a matter of fact, to abide by the above consultation process and its failure, as a matter of fact, to take into account the tribal canon of construction for construing federal statutes with tribal implications.

- As a result, DOL failed to construe ambiguity in favor of the Tribe and failed to consider tribal specific factors in considering mitigation of penalties.
- As a result, the DOL's interpretation of ERISA Section 3(32) and its application of the Form 5500 filing, penalty waiver and mitigation rules was flawed and contrary to federal-tribal policies and the interest of tribal governments.
- This failure resulted in DOL treating the Tribe's Plan as commercial without taking into account factors that were and are under consideration by IRS and Treasury for the same definitions under the PPA.
- This failure resulted in a conflict between how DOL, Treasury and IRS were and are addressing the PPA.  DOL was under a duty to resolve this conflict per 29 U.S.C. § 1204.
- This failure resulted in DOL assessing penalties against the Plan in violation of the mitigation regulations.
- Even if the Plan would have been treated as commercial, DOL's denial of penalty relief to the Tribe prior to final guidance under the PPA was tainted by DOL's failure to consider tribal-specific factors of mitigation, and was contrary to its policy or practice that IQPAs would not be required through the Transition Period.

231.    References to Deemed Employees herein is not intended to imply that the Tribe's Plan included "commercial" employees for purposes of any final rules under the PPA. The Tribe specifically alleges that its Plan was a governmental plan under the PPA and ERISA Section 3(32), and that all employees participating in its plan were performing essential governmental functions that were not commercial in nature.  No final rule or guidance to the contrary was announced by DOL or Treasury at any time relevant to this case.

232.    While the Tribe concedes that its Plan included employees who it was required to treat as "commercial" for the limited purpose of receiving IRS Transition Relief, the Tribe never waived its right to assert that such employees were governmental.

233.    The Tribe alleges that DOL violated ERISA by failing to consider specifics with regard to how the White Mountain Apache Tribe, and its enterprises, are structured and operated.

234.    The DOL's application of PPA commercial standards was an abuse of discretion as DOL did not take into account how the White Mountain Apache Tribe actually operated the enterprises that DOL deemed "commercial".  Nor was DOL willing to engage in such a review.

235.    The Tribe alleges that all tribal governments are unique and that the determination of a tribal "commercial" activity requires more than a "one size fits all" label.

236.    In this regard, the Tribe alleges that some entities with the same label could be commercial while other entities with the very same label may not be commercial.  For example:

- A private grocery store that sells food and supplies may be considered commercial while a government commissary may not. They both sell food and supplies.
- A private for-profit university may be treated differently than a non-profit public school.  They both provide education.
- A state government that operates a lottery to raise public funds is certainly treated differently than the MGM.  Both engage in gaming.
- A state or city government that owns a conference center is certainly different from a commercial enterprise like Hilton Hotels.

237.    On information and belief, the DOL never considered alternative definitions of "commercial" that would have taken into account such differences.

238.    DOL did not and would not engage in any discussions with the Tribe regarding such differences.

239.    The Tribe presented numerous factors to support mitigation.  On information and belief, DOL did not consider them as DOL had "pre-concluded" that all tribal enterprises are the same.

**Additional Allegations Regarding Constitutional Concerns and Limitations**

240.    In addition to the due process and equal protection concerns noted above, the Tribe alleges that application of ERISA to the Tribe before having resolved key substantive

concerns through regulation, consultation, waiver or amendment, would violate the United States Constitution. For example:

241.    ERISA section 502(e)(1), 29 U.S.C. § 1132(e)(2), addresses private litigation against plan administrators in state and federal courts, but does not address tribal courts. Subjecting one sovereign to defend itself in another sovereign's forum (particularly a tribe being sued in state court without its consent) raises fundamental issues of tribal sovereignty.

242.    ERISA Section 206(d)(3)(B)(ii), 29 U.S.C. § (d)(3)(B)(ii) at times relevant to the claims in this action addressed the division of benefits under state domestic relations law, but did not address tribal domestic relations law.   Tribal domestic relations law is a fundamental right of tribal sovereignty.

243.    The impact of these rules may differ depending on how a tribal enterprise is structured and specific tribal laws.   On information and belief, DOL did not consider these issues.

244.    In the event that DOL is not able to resolve ambiguity in the terms essential governmental function and commercial activities through consultation and rulemaking under the APA, the Supreme Court has already struck down ad hoc attempts to apply similar terms as unconstitutional under *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 541-542 (1985)).

### **Standards Upon Which DOL Discretion May be Judged**

245.    DOL has asserted in this litigation that its final agency actions in this case should be wholly unreviewable because DOL is allegedly granted broad discretion with no standards by which its conduct can be judged.  This is incorrect.

246.    If DOL is correct that the Tribe was required to file IQPAs for the years in question (contrary to DOL's policies and pre-litigation representations to the contrary), the Tribe alleges that DOL failed to comply with applicable regulations (including 29 C.F.R §§ 2650.502c-2 and 29 C.F.R. §§ 2570.60-71, the "mitigation regulations") by failing to take into consideration the degree and/or willfulness of the failure or refusal to file such IQPAs, by failing to take into account mitigating circumstances, and by failing to follow procedural requirements in making such determinations.

247.    Nor were the review decisions made in accordance with "expeditious[]" adjudicatory procedures as required by 29 C.F.R. § 2570.60.

248.    By calling for DOL to weigh "mitigating circumstances", the mitigation regulations limit DOL's discretion and require that specific facts and circumstances be considered.  On information and belief, DOL failed to do so.

249.    By calling for DOL to weigh the "degree" of noncompliance, the mitigation regulations limit DOL's discretion and require that specific facts and circumstances be considered.  On information and belief, DOL failed to do so.

250.    By calling for DOL to weigh the "willfulness" of noncompliance, the mitigation regulations limit DOL's discretion and require that specific facts and circumstances be considered.  On information and belief, DOL failed to do so.

251.    DOL's discretion is limited by 29 CFR §§ 2560.502c-2(g), which requires the DOL to review "all the facts alleged in support of no assessment or a complete or partial waiver of the penalty".  On information and belief, DOL failed to do so.

252.    In determining what is a tribal "essential governmental function" or a tribal "commercial" activity under the PPA, the DOL could have looked, for example, to standards

based on tribal laws, culture and traditions; federal policies under statutes such as the Indian Self-Determination and Education Assistance Act; and analogous activities engaged in by state and local governments.  On information and belief, DOL failed to do so.

253.    In determining what is a tribal "essential governmental function" or a tribal "commercial" activity under the PPA, whether tribal IQPAs should be required during the Transition Period, or whether penalties should be assessed against tribes for failure to file IQPAs during the Transition Period, DOL was required to consult with Treasury over shared definitions and requirements.  On information and belief, DOL failed to do so.

254.    In determining what is a tribal "essential governmental function" or a tribal "commercial" activity under the PPA, the DOL could have also looked, for example, to standards suggested by the IRS Advisory Committee on Tax Exempt Entities (ACT); input from IRS and Treasury consultation sessions; and input from federal agencies that have expertise with regard to tribal government issues and operations such as the Bureau of Indian Affairs.  On information and belief, DOL failed to do so.

255.    The PPA itself, and its legislative history noted above, provides meaningful standards upon which DOL was required to have tempered its discretion.  The statute was urged by tribes to clarify equal status with state and local government plans.  The legislative sponsors worked with tribes to promote equal status with state and local government plans.

256.    The foregoing standards, the federal trust responsibility, the federal-tribal policies of self-determination and self-governance, the cited Executive Orders, and the cited DOL policies all place limitations on the DOL's discretion in construing the PPA and in applying its Form 5500 filing, penalty waiver and mitigation procedures as applied to tribal plans and in developing guidance under the PPA.

257. The wrongful conduct by DOL is not limited to DOL's decision of whether or not to prosecute or charge the Tribe for ERISA penalties, but also includes the manner in which they defined key terms under the PPA which are a precondition to the Plan's coverage under ERISA, and to the DOL's own jurisdiction over the Tribe,  the manner in which they violated their own policies and procedures limiting their discretion, their violation of tribal canons of construction, and their violation of standards required by the mitigation regulations (which further limit their discretion).

258. Moreover, DOL is not correct when it characterizes this case as only a dispute about DOL's prosecutorial discretion over enforcement actions.  This case is also about DOL's pre-enforcement conduct in which EBSA decided that tribes did not have to file IQPAs at all during the Transition Period; and then changed that position without notice.

259. The Tribe hereby incorporates by reference all documents, policies, orders, decisions, letters and EBSA memos referred to herein.


**FIRST CAUSE OF ACTION**
**Review of Final Order Re: Statutory Penalties**
**[ERISA Sections 502(k) and 502(c)(2)]**

260. The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

261. Unlike many statutes where prosecutorial discretion has been looked to in weighing whether an express review of final agency actions should be implied, Section 502(k) of ERISA, 29 U.S.C. § 1132(k) expressly authorizes suits by an administrator of an employee benefit plan to review a final order of the Secretary [DOL] in the United States District Court for the District of Columbia.

262.    DOL is authorized to grant relief and/or waive IQPA filing requirements under ERISA regardless of how "commercial" activities or government status is ultimately defined under the PPA.  DOL did so in this case, and then (in violation of its ERISA-sanctioned policy and the APA) changed its position without notice.

263.    In the exercise of its prosecutorial discretion in deciding when to charge or enforce penalties, and again in conducting its post-charge review, DOL is limited in its discretion by the policies, regulations, statutes and standards referenced above. On information and belief, DOL has violated these standards.

264.    Without limitation, DOL on information and belief violated 29 CFR § 2560.502c-2(b) and (d) by not considering mitigating circumstances regarding the degree and/or willfulness of the Tribe's failure or refusal to file and IQPA.  DOL on information and belief also violated this standard by construing willfulness to be "a voluntary act" with no consideration of culpability or bad intent.

265.    Without limitation, DOL on information and belief violated 29 CFR § 2560.502c-2(d) by not considering mitigating circumstances regarding the degree or willfulness of noncompliance.

266.    Without limitation, DOL on information and belief violated 29 CFR §§ 2560.502c-2(e) and (g), by not considering "all the facts alleged in support of no assessment or a complete or partial waiver of the penalty"

267.    Without limitation, DOL on information and belief violated the mitigation regulations by inconsistent application of "willfulness".

268.    Without limitation, DOL on information and belief violated 29 U.S.C. 1204, by not coordinating with Treasury before changing policies over terms and requirements for which there is shared responsibility.

269.    Without limitation, DOL on information and belief developed and then changed federal-tribal policies without taking into account the government-to-government relationship between the Tribe and the United States, including those duties referred to in Executive Order 13175, DOL consultation policies, and those arising out of the federal trust responsibilities and/or common law duties and obligations owed by the United States to the Tribe.

270.    In administering Section 502(c), the DOL owes a duty to administer the laws equally and consistently, including rules and policies regarding whether IQPAs are required to be filed.  DOL breached this duty by exempting tribes from IQPA requirements and then changing this policy without notice.  The filings requirements and duties referred to herein are separate from prosecutorial enforcement actions and penalty assessments for filing requirements after they are announced.

271.    In administering Section 502(c) the DOL owes a duty not to apply mitigation factors arbitrarily.  DOL on information and belief applied mitigation factors arbitrarily and inconsistently, beyond legitimate differences that would be justified taking into account individual facts and circumstances.

272.    In administering Section 502(c)(2), the DOL must comply with the Administrative Procedures Act, due process and equal protection of the laws, and other such requirements to ensure proper rulemaking.  DOL was required to provide the Tribe notice of PPA requirements before enforcement, and prior notice of changes to the deadlines and other conditions for Transition Relief.  Once DOL decided that IQPA filings were not required during

the Transition Period, DOL was required to announce any change in policy requiring IQPAs in order to avoid unfair surprise.  DOL failed to so do.

273.    In interpreting the PPA and in turn administering Section 3(32) and 502(c), the DOL was required to coordinate Transition Relief and consultation efforts with Treasury.  *See, e.g.*, 29 U.S.C. § 1204.   DOL on information and belief breached this ERISA duty by changing policies over shared provisions or requirements without coordinating changes with Treasury.

274.    As set forth more fully in the text of the Complaint, DOL has breached each of the foregoing duties.

275.    The Tribe has exhausted all required administrative remedies under WMAT I and WMAT II, and the DOL penalty assessments in each case are final orders of the Secretary [DOL] ripe for judicial review.

276.    For the reasons set forth above, DOL has abused its discretion and violated the foregoing laws, regulations, and duties.

277.    As a direct and proximate cause of DOL's improper conduct, the Tribe has suffered damages equal to $140,000 in Section 502(c)(2) penalties improperly assessed and paid. The Tribe is entitled to reimbursement of these payments.

278.    The Tribe is also entitled to attorney's fees under ERISA Section 502(g), 29 U.S.C. Section 1132(g).

**SECOND CAUSE OF ACTION**
**Injunctive Relief**
**[ERISA Sections 502(k)]**

279.    The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

-55-

280.     Section 502(k) of ERISA, 29 U.S.C. 1132(k) authorizes suits by an administrator of an employee benefit plan to restrain the Secretary [DOL] from taking any action contrary to the provisions of Title 29, Chapter 18 [ERISA], or to compel the Secretary [DOL] to take action required under Title 29, Chapter 18, Subchapter I [ERISA - Protection of Employee Benefit Rights] in the United States District Court for the District of Columbia.

281.     ERISA does not authorize the DOL to assert jurisdiction or assess penalties against government sponsors of a governmental plan.  See, e.g., ERISA Sections 4(b)(1) and 3(32), 29 U.S.C. §§ 1003(b)(1), 1002(32).    DOL should be enjoined from doing so as against the Tribe in connection with the Plan.

      a.      DOL has and continues to misinterpret "essential governmental functions" and "commercial activities" in the PPA and Section 3(32) of ERISA. Without limitation, DOL has violated the required tribal canons of construction requiring ambiguity to be resolved in favor of tribes.

      b.      The Tribe's Plan is a governmental plan within the meaning of ERISA Section 3(32).

282.     In the event that the Tribe's Plan does not qualify as a governmental plan under ERISA Section 3(32), DOL has and continues to violate its own mitigation regulations regarding Form 5500 penalty waivers and mitigation as referenced herein.  DOL should be enjoined from doing so.  In this regard, DOL should be required to consider facts as required by the ERISA mitigation regulations before making assessments.   DOL should also be prohibited from construing "willfulness" as a voluntary act.

283.     The Tribe seeks an order compelling the DOL to apply the tribal canon of construction in construing the PPA and ERISA Section 3(32).

284.    DOL is authorized under ERISA to grant relief and exemptions from IQPA requirements.  DOL exercised this authority and accepted that no IQPAs would be required until after the Transition Period.  DOL is subject to the APA in establishing such ERISA policies. DOL changed this position without notice in violation of ERISA and the APA.   The Tribe seeks an order prohibiting changes of these ERISA compliance policies without notice.

285.    The Tribe seeks an Order compelling DOL to consult with tribes and other agencies with jurisdiction over the PPA in developing guidance under the PPA and ERISA including the definitions of "essential governmental functions" and "commercial activities", and the filing requirements for Tribal plans.

286.    The Tribe cannot be punished by DOL under ERISA or the APA for failing to perform tasks that are not possible to perform without further guidance.  The Tribe seeks an order compelling DOL to work with tribes and other agencies with jurisdiction over PPA to issue guidance needed by the Tribe to file ERISA compliant IQPAs, including CPA standards and operational guidance as referred to herein.

287.    The Tribe is also entitled to attorney's fees under ERISA Section 502(g), 29 U.S.C. Section 1132(g).

## THIRD CAUSE OF ACTION
### (Administrative Procedures Act)

288.    The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

289.    Under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 551 et seq., courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right"; "without observance of procedure required by law"; or "unwarranted by the facts"." 5 U.S.C. § 706(2).

290.    Compliance with the APA does not allow an agency to establish a rule and then change it without notice and with unfair surprise, particularly where the federal government owes the regulated entity a duty of trust. As above alleged, DOL violated the APA by doing so against the Tribe in this case.

291.    Under the APA, an agency is not entitled to deference with regard to policies or matters for which it does not have experience or expertise.  The DOL has no expertise with regard to tribal government matters.

292.    The Tribe was entitled to rely on representations from EBSA with regard to no IQPAs being required prior to the close of the Transition Period and the issuance of guidance. DOL violated the APA by its change in position without following proper rulemaking.

293.    Applying the PPA against the Tribe before having resolved the constitutional concerns and limitations set forth above, and by changing its position on the need for IQPA filings without notice and proper rulemaking, was not "in accordance with the law."

294.    The foregoing conduct by DOL violates the APA as their actions were (a) arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (d) without observance of procedure required by law; and/or (e) unwarranted by the facts.

### FOURTH CAUSE OF ACTION
**(Estoppel)**

295.    The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

296.    Estoppel is alleged only in the alternative if relief cannot otherwise be afforded under prior counts.

297.    EBSA adopted a policy confirming that tribes did not have to file IQPAs during the Transition Period.

298.    EBSA was authorized to adopt the foregoing policy and on information and belief, the policy was approved by the highest ranks within EBSA, acting within the scope of their duties.

299.    The Tribe reasonably relied on this policy in a manner to change its position for the worse, and to its detriment.

300.    In changing its position, EBSA is now seeking to enforce penalties and filing requirements that are not possible for the Tribe to comply with.

301.    Estoppel in this context will not produce a result that is against the interest of the citizenry, as reporting needs of the citizenry can be met with advance guidance that DOL has had 17 years to issue.

302.    The government's interest against estoppel in this case is outweighed by countervailing interests of citizens, and tribal governments in particular, in some minimum standards of decency, honor and reliability in their dealings with the government.

303.    Estopping the government from retroactively requiring IQPAs for periods during which EBSA had a policy confirming they were not needed, or from enforcing future IQPAs until proper rulemaking is followed, or from requiring reports that would rely on prior data that cannot be reconstructed without additional guidance, is in the interest of the citizenry.

304.    The Tribe does not seek money damages through estoppel.  The Tribe seeks to hold the government true to its promise to not hold the Tribe to rules before informing the Tribe

of the rules they intend to enforce, and informing the Tribe of changes to rules when changes are made.

305.    Estoppel is justified in this case by the alleged acts and omissions of EBSA, and the special relationship of trust between the federal government and tribal governments.

306.    Changing its policies without notice and with unfair surprise, and without compliance with the APA, coupled with the acts and omissions alleged above, satisfies any notion of the need to plead estoppel based upon affirmative misconduct.    Allowing such misconduct would be egregious and result in prejudice to the Tribe rising to a constitutional level.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff, the Tribe, granting the following relief:

1.    Damages as requested in Count I equal to a refund of $140,000 in Section 502(c)(2) penalties, and interest therein, that have been improperly assessed.

2.    Injunctive relief as requested in Count II.

3.    An order setting aside the DOL's decisions in WMAT I and WMAT II.

4.    Declaratory relief in the form of the following Orders:

a.    That the Tribe is not required to file an IQPA until after DOL issues guidance on when and how those filings are to be made.

b.    That the DOL is required to work with Treasury and tribes to develop guidance under the PPA, including definitions of "essential government functions" and "commercial" activities.

c.    That the terms "essential governmental functions" and "commercial activities" as used in the PPA are ambiguous.

  d.  That DOL is required to construe ambiguity in the definition of essential governmental functions and commercial activities by applying the tribal canon of construction.

  e.  That to the extent the PPA terms "essential governmental functions" and "commercial activities" are construed on an ad hoc and inconsistent basis, and without APA compliant rulemaking, such terms are unconstitutional.

  f.  That DOL may not diminish the Tribe's government status by policy or practice without engaging in consultation and rulemaking under the APA.

  g.  That DOL's acts and omissions as alleged above violated Section 906 of the PPA.

  h.  That DOL's acts and omissions as alleged above violated ERISA Section 502(c) and the regulations thereunder.

  i.  That DOL's acts and omissions as alleged above violated the Tribe's due process and equal protection rights under the United States Constitution.

5.  All costs, fees, and other damages as a result of Defendants' breaches (including those permitted under ERISA 29 U.S.C. §1132(g)); and

6.  Any and such other relief the Court deems proper.

The undersigned has attached a redline comparison of the original and amended pleading per previous procedures before the Court.

DATE: July 3, 2023

s/Robert R. Yoder
Robert R. Yoder, Esq. (AZ0021)
YODER & LANGFORD, P.C.
8175 East Evans Road, # 13598
Scottsdale, Arizona 85267
Telephone:  (602) 808-9578
Facsimile:  (602) 468-0688
robert@yoderlangford.com

Attorneys for the White Mountain Apache Tribe